USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2-20-08

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------X
IN RE FRESH DEL MONTE PINEAPPLES          :
ANTITRUST LITIGATION.                      :          No. 1:04-md-1628 (RMB)
--------------------------------------------------------------------X
This Document relates to All Actions.      :          **DECISION AND ORDER**
--------------------------------------------------------------------X

**I.      Background**

On August 18, 2004, a [Corrected] Consolidated Direct Purchaser and Indirect Purchaser

Class Action complaint ("Complaint") was filed against Del Monte Fresh Produce Company and

Del Monte Fresh Produce, N.A., Inc. ("Del Monte" or "Defendants"), on behalf of all those who

purchased "Fresh Del Monte Gold" pineapples ("Plaintiffs") in the United States over the past

twelve years, i.e., from March 1, 1996 to the present ("Class Period").  Plaintiffs allege that,

during the Class Period, Del Monte "improperly obtained and maintained a monopoly over the

propagation, marketing, and sale of fresh, whole, extra-sweet pineapple . . . by: (i) securing a

patent, through the prosecution of a fraudulent patent application with the United States Patent

and Trademark Office ('PTO') for a pineapple variety it knew, and has now admitted, was

unpatentable . . . ; (ii) issuing intentionally false and misleading letters to competitors and others

stating that the 'Fresh Del Monte Gold™' pineapple was patented by Defendants and threatening

litigation if they engage in the propagation, marketing, or sale of that pineapple . . . ; [and] (iii)

commencing and pursuing sham patent litigation in order to foreclose competition in the fresh,

whole, extra-sweet pineapple market . . . ." (Compl. ¶ 3.)  According to Plaintiffs, "Defendants

used their unlawfully obtained monopoly power to charge supracompetitive prices for the Gold

pineapples, thereby causing both direct and indirect purchasers of the Gold pineapples to sustain

injury to their business and property." (Id. ¶ 12.)

Plaintiffs include both Direct Purchasers, i.e., all those who purchased Fresh Del Monte

Gold pineapples directly from Del Monte (such as IGA, Publix Super Markets, Whole Foods Market), and Indirect Purchasers, i.e., "all end-payors," including "consumers, the last persons . . . in the chain of distribution" who purchased such pineapples. (Compl. ¶¶ 14-15.) The Direct Purchasers assert claims of monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2; and common law claims for "restitution/disgorgement/unjust enrichment" under the laws of the 50 States and the District of Columbia. (Comp. ¶¶ 112-38.) The Indirect Purchasers assert claims of monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2 (Compl. ¶¶ 130, 135); common law claims for "restitution/disgorgement/unjust enrichment" under the laws of the 50 States and the District of Columbia (id. ¶¶ 136-38); claims for damages under the anti-monopoly statutes of 21 States and the District of Columbia (id. ¶¶ 139-63); and claims for restitution and/or damages under the consumer protection statutes of 44 States and the District of Columbia (id. ¶¶ 164-211).[1]

On June 30, 2005, Plaintiffs moved pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 23(b)(3) for certification of two proposed classes, namely Direct and Indirect Purchasers ("Direct Purchaser Class" and "Indirect Purchaser Class"). (See Direct Purchaser and Indirect Purchaser Plaintiffs' Memorandum of Law, dated June 30, 2005 ("Pl. Cert. Mem."), at 1-2.)[2] On September 22, 2005, Defendants opposed certification of a Direct Purchaser Class with

---

[1] With respect to the Sherman Act claims, the Direct Purchasers seek injunctive relief and (treble) damages, while the Indirect Purchases seek only injunctive relief. (Id. ¶¶ 112-35.)

[2] The "Direct Purchaser Class" would consist of: "All persons or entities . . . who purchased a 'Fresh Del Monte Gold ™' pineapple directly from [Defendants] in the United States (including the District of Columbia and Puerto Rico), from March 1, 1996 and continuing to the present." (Compl. ¶ 98.) The "Indirect Purchaser Class" would consist of: "All persons and entities in the United States who, at any time from March 1, 1996 to the present, purchased Del Monte Gold Pineapples in the United States other than for re-sale," and excluding, among others, "any person or entity that purchased [such pineapples] directly from any Defendant." (Compl. ¶ 105.)

respect to the unjust enrichment claims and certification of an Indirect Purchaser Class with respect to all claims. (See Defendants' Opposition to Class Certification, dated Sept. 22, 2005 ("Def. Cert. Mem."), at 1 (Defendants "do[] not oppose interim certification of a class of direct purchasers with respect to their Sherman Act § 2 claim.").) On September 26, 2005, Plaintiffs filed reply papers supporting class certification.

On July 26, 2006, the Court directed the parties to submit additional information concerning the "manageability" under Fed.R.Civ.P. 23(b)(3) of the proposed Indirect Purchaser Class, including, among other things, "projected size of the Class; . . . proposed method of effecting notice to the Class; . . . nature of evidence supporting individual claims; and . . . (any) cy pres distribution proposed by Plaintiffs." (Order, dated July 26, 2006.)[3] And, at a conference on August 1, 2006, the Court explained some of its concerns regarding "manageability" and requested Indirect Purchaser Class counsel to submit "hard evidence or data" regarding, among other things, "how much of the recovery, if there were one," would be in the form of "cy-pres and what percentage is going to be to people who can demonstrate that they bought a pineapple, and with specificity." (Transcript of Aug. 1, 2006, Conference, at 11-12.) On August 22, 2006, Plaintiffs submitted a Supplemental Memorandum Concerning Manageability, and on October 4, 2006, Defendants submitted a Supplemental Memorandum Concerning Manageability.

On March 23, 2007, the Court held an evidentiary hearing concerning the issue of "manageability" of the Indirect Purchaser Class.[4] (See Transcript of March 23, 2007 Evidentiary Hearing ("Tr.").) Plaintiffs submitted direct testimony by declaration (or deposition) of Joseph

---

[3] See Fed. R. Civ. P. 23(b)(3) ("The matters pertinent to the findings include . . . the difficulties likely to be encountered in the management of a class action.").

[4] At the hearing, the Court was able to assess witness demeanor and credibility.

Fisher, a settlement administrator (see Fisher Declaration, dated Aug. 22, 2006 ("Fisher Decl.");

Supplemental Fisher Declaration, dated March 14, 2007 ("Supp. Fisher Decl.")), and of

Dionysios Christou, Del Monte's Vice President of Marketing for North America (see Christou

Deposition, dated Feb. 21, 2007).  In rebuttal, Defendants submitted direct testimony by

declaration (or deposition) of Emanuel Lazopoulos, Del Monte's Senior Vice President for North

American Sales, Marketing and Product Management (see Lazopoulos Declaration, dated Oct. 3,

2006 ("Lazopoulos Decl.")), Dr. Bradley N. Reiff, an economist (see Reiff Declaration, dated

Sept. 15, 2005 ("Reiff Decl."); Reiff Supplemental Declaration, dated Oct. 3, 2006 ("Reiff Supp.

Decl.")), and Dr. Frank D. Tinari, an economist (see Declaration of Carl E. Goldfarb (attaching

Tinari Damages Report, dated June 28, 2005 ("Tinari Report"); Tinari Deposition, dated August

23, 2005; Tinari Declaration, dated Sept. 22, 2005; Tinari Supp. Damages Report, dated Dec. 23,

2005 ("Tinari Supp. Report"); Tinari Deposition, dated March 7, 2006)).  Mr. Fisher and Mr.

Christou also testified in person (upon cross-examination) at the hearing.

    Following the March 23, 2007 hearing, Plaintiffs submitted Proposed Findings of Fact

and Conclusions of Law, dated April 16, 2007 ("Pl. Findings"), arguing that the Indirect

Purchaser Class is manageable because, among other reasons: (1) the total "quantum of damages

suffered by the class . . . [is a] merits issue[] that cannot be resolved at the certification stage"

(id. at 30); and (2) damages can be distributed to the Indirect Purchaser Class ("Class Members")

through a combination of "automatic price reductions," "a formal claims procedure," and "a cy

pres distribution" (id. at 12).  Defendants submitted Proposed Findings of Fact and Conclusions

of Law, dated May 11, 2007 ("Def. Findings"), arguing that the Indirect Purchaser Class is  not

manageable because, among other reasons: (1) Plaintiffs failed to "present a damages model that

can be used on a class-wide basis based on common proof" and erroneously assumed that the

"pass-through rate," i.e., "the percentage of the potential monopoly overcharge in Del Monte's prices that was passed-through by direct purchasers to indirect purchasers," is 100% throughout the entire Class Period (id. at 9-10, 23-24); and (2) Plaintiffs failed to present a reliable method of distributing damages to putative Class Members because, among other reasons, the "automatic price reductions" plan is "fundamentally flawed because it depends ultimately on the alleged pattern of repeat purchase[s] by a core group of customers," the "claim administration process is . . . likely to be of questionable reliability in this case," and the "cy pres doctrine is inapplicable." (id. at 16-17, 19, 30, 32). Plaintiffs submitted a Reply Memorandum, dated May 25, 2007.[5]

**For the reasons set forth below, the Court certifies a Direct Purchaser Class with respect to the Sherman Act claims and does not certify an Indirect Purchaser Class.**

## II.    Legal Standard

Where plaintiffs seek certification of a class under Rule 23(b)(3), the court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). "The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3); see 5 Moore's Federal Practice, § 23.44[1] (3d ed. 2007) ("These guidelines

---

[5] Defendants also submitted a "Sur-Reply," dated June 1, 2007, which largely repeats their arguments. See Perez v. City of New York, 2007 WL 14486, at *10 n.3 (E.D.N.Y. Jan. 3, 2007).

reflect the purpose of a Rule 23(b)(3) class action, which is designed to be a means of achieving economies of time, effort, and expense."). "There is no requirement that a court review all four factors in every case . . . ." Moore's, § 23.46[2][a]; see, e.g., Eisen v. Carlisle & Jacquelin, 479 F2d 1005, 1011-12 (2d Cir. 1973), vacated on other grounds, 417 U.S. 156 (1974).

Manageability "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 164 (1974); see, e.g., Eisen, 479 F.2d at 1008 ("the lawsuit is unmanageable as a class action . . . and no 'fluid recovery' procedures are authorized by the text or by any reasonable interpretation of amended Rule 23"). "An unmanageable class is an indication that individual issues predominate over common questions of law and fact and that there is a better method of adjudicating these issues." Pitt v. City of Portsmouth, Va., 221 F.R.D. 438, 446 (E.D. Va. 2004); see Romero v. Philip Morris Inc., 137 N.M. 229, 242, 109 P.3d 768, 781 (N.M. Ct. App. 2005) ("Predominance and superiority are often peas in the same pod when management of a class action is at issue. That is, the management issue is relevant to both predominance and superiority.").

"[A] district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; [and] such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met . . . ." In re Initial Public Offering Secs. Litig., 471 F.3d 24, 40-41 (2d Cir. 2006) ("the ultimate issue as to each requirement is really a mixed question of fact and law"). "[A] hearing may be particularly useful, as well as necessary, when the paper record before the

court on the certification motion is inadequate to support a decision with regard to whether a class action should be maintained." 7AA Wright, Miller & Kane, Federal Practice and Procedure § 1785 (3d ed. 2007); see Federal Judicial Center, Manual for Complex Litigation § 21.21 (4th ed. 2004) ("A hearing under Federal Rule of Civil Procedure 23(c) is a routine part of the certification decision.").

### III.   Analysis

### Direct Purchaser Class

Del Monte "opposes certification of a direct purchaser class with respect to the alleged unjust enrichment claims," but "does not oppose interim certification of a class of direct purchasers with respect to their Sherman Act [§] 2 claim[s]." (Def. Cert. Mem. at 1.)  Because the Direct Purchasers' unjust enrichment claims are being dismissed in a separate Order, dated February 20, 2008, certification of a class asserting those claims is denied as moot.  See Tash v. Zenk, 2005 WL 503938, at *4 (E.D.N.Y. Feb. 14, 2005).  The Court does certify a Direct Purchaser Class with respect to the Sherman Act claims, on consent, and for the following reasons:

With respect to Rule 23(a), Plaintiffs meet the criteria of "numerosity," "commonality," "typicality," and "adequacy of representation."  Fed. R. Civ. P. 23(a).  The "numerosity" requirement is satisfied because joinder of all (over 500) class members would be "impracticable" Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993), and numerosity is generally "presumed at a level of 40 members," Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995).  The "commonality" requirement is met here because the Direct Purchasers' grievances share common questions of law and fact.  Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 155-56 (2d Cir. 2001).  "Numerous courts have held that

allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy

present important common questions sufficient to satisfy the commonality requirement of Rule

23(a)(2)." In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 510 (S.D.N.Y.

1996). "Typicality" "'is satisfied when each class member's claim arises from the same course of

events, and each class member makes similar legal arguments to prove the defendant's liability.'"

Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (citation omitted); see In re Playmobil

Antitrust Litig., 35 F. Supp.2d 231, 241-42 (E.D.N.Y. 1998) ("claims in antitrust price-fixing

cases generally satisfy Rule 23(a)(3)'s typicality requirement, even if members purchase different

quantities and pay different prices").

     To prove "adequacy of representation" under Rule 23(a)(4), Plaintiffs must establish that

(1) "'class counsel is qualified, experienced, and generally able to conduct the litigation,'" and (2)

"there is no conflict of interest between the named plaintiffs and other members of the plaintiff

class." Marisol A., 126 F.3d at 378 (citation omitted). Counsel for the Direct Purchaser Class,

Pomerantz Haudek Block Grossman & Gross LLP appear to meet this requirement. See, e.g.,

Steinberg v. Nationwide Mut. Ins. Co., 224 F.R.D. 67, 76 (E.D.N.Y. 2004). There is no

evidence of conflict between named Plaintiffs and the Class, as they share in common the central

issues in this case, they suffered the same type of injury, and they have the same interest in

obtaining relief.

     With respect to Rule 23(b)(3), "[p]roof of the allegedly monopolistic and

anti-competitive conduct at the core of the alleged liability is common to the claims of all the

plaintiffs." In re Buspirone Patent Litig., 210 F.R.D. 43, 58 (S.D.N.Y. 2002). And, the

superiority requirement is satisfied because "[t]he management difficulties of a direct purchaser

class action are not substantial, and indeed [Del Monte] has not disputed that [a] direct purchaser

class action is appropriate. Under the circumstances, a class action is the superior method of adjudicating the claims at issue." Id.

### Indirect Purchaser Class

### Determinations Following March 23, 2007 Hearing[6]

1.      The Indirect Purchaser Class is not manageable (within the meaning of Fed.R.Civ.P. 23(b)(3)) for two principal reasons: (1) Plaintiffs failed to satisfy their burden of "present[ing] a damages model that can be used on a class-wide basis" (Def. Findings at 23-24); and, relatedly, (2) Plaintiffs failed to present a reliable method of distributing any damages to putative Class Members (id. at 30).[7]

2.      At the March 23, 2007 hearing, Plaintiffs declined to offer evidence to support a methodology for determining damages on a class-wide basis.  (See Pl. Findings at 30-31 ("Del Monte's argument . . . relates to the quantum of damages suffered, not manageability or certification."); id. at 30 (According to Plaintiffs, "[t]he quantum of damages suffered by the class, antitrust impact, and even the ending date for a class period, are all merits issues that cannot be resolved at the certification stage without generating an 'unwieldy trial on the merits.'" (citation omitted)).)  See also In re Rezulin Prods. Liab. Litig., 224 F.R.D. 346, 351-52 (S.D.N.Y. 2004).

3.      The damages reports, submitted on or about June 28, 2005 and December 23,

---

[6] The parties' written submissions in connection with the March 23, 2007 hearing and the hearing transcript are incorporated herein by reference.  (See Hearing Transcript, dated March 23, 2007.)

[7] Because the Court denies certification on these grounds, the Court does not address Defendants' additional argument that Rule 23(b)(3) is not satisfied because "the application of myriad state laws means individual issues will predominate." (Def. Cert. Mem. at 12-32.)  And, because Rule 23(b) is not satisfied, the Court does not address whether Rule 23(a) is satisfied.  Grandon v. Merrill Lynch and Co., Inc., 2003 WL 22118979, at *3 (S.D.N.Y. Sept. 11, 2003).

2005, by Plaintiffs' economic expert, Dr. Frank D. Tinari (see Tinari Report; Tinari Supp. Report), do not satisfy Plaintiffs' burden.[8] Tinari speculates that Del Monte's total alleged monopoly overcharge to wholesalers (Direct Purchasers) from 1999 through 2005 was approximately $128 million, and assumes that 100% of "the overcharges to wholesalers" were "passed along to consumers." (Tinari Supp. Report at 17-20.) By assuming a 100% pass-through rate throughout the entire Class Period, Tinari argues that total damages can be calculated based upon aggregate data, thus avoiding the "difficulties" in "find[ing] data for the actual transaction prices paid by consumers and the quantities of pineapples purchased by consumers over the relevant time period." (Tinari Report at 8-9.)

4.      Defendants submitted declarations, dated September 15, 2005 and October 3, 2006 from Dr. Bradley N. Reiff, an economist and Senior Vice President of Lexecon, Inc., which persuasively rebut Tinari's conclusions. (See Reiff Decl.; Reiff Supp. Decl.) According to Reiff, "the pass-through rate is defined as the percentage of the potential monopoly overcharge in Del Monte's prices that is passed through to indirect purchasers in the form of an increase in prices paid by indirect purchasers." (Reiff Supp. Decl. ¶ 6.) "[E]conomic theory allows for a range of pass-through rates from zero to over 100 percent. Therefore, the determination of the appropriate pass-through rate for any particular situation is an empirical question. . . . The empirical analysis necessary to estimate a pass-through rate requires estimation of the relationship between wholesale price changes and retail price changes across time and location."

---

[8] On March 20, 2007, the Indirect Purchasers filed Objections to the Declaration of Carl E. Goldfarb, dated March 14, 2007, which challenges Dr. Tinari's testimony ("Goldfarb Declaration"), arguing that "[r]ather than simply paraphrasing what Dr. Tanari testified to in his deposition and citing to the transcript, Mr. Goldfarb . . . provides his own commentary and argument." (Pl. Findings at 31.) See Charter Oak Fire Ins. Co. v. National Wholesale Liquidators of Lodi, 2002 WL 519738, at *6 n.6 (S.D.N.Y. April 5, 2002).

(Reiff Supp. Decl. ¶ 6.)  "Rather than developing such a reliable damages methodology, Dr. Tinari presents a methodology that assumes a uniform pass-through rate with respect to an alleged overcharge on gold pineapples sold to indirect purchasers."  (Reiff Decl. ¶ 4.)  That is, Tinari has not performed any "detailed empirical analysis," and instead relies upon very limited data relating wholesale to retail prices.  (Reiff Supp. Decl. ¶ 6.)

     5.      Reiff also persuasively argues that "[e]xamination of Dr. Tinari's wholesale and retail price data shows that Dr. Tinari's conclusions are not supported by his data."  (Reiff Supp. Decl. ¶¶ 6-7; <u>see</u> Reiff Decl. ¶ 1.)  For example, the data for the years 2002 through 2005 "show that although wholesale prices declined each year, in two of the three year pairs (2002 to 2003 and 2004 to 2005), retail prices increased," which would "not support a conclusion of 100 percent pass-through, or even a pass-through rate greater than zero."  (Reiff Supp. Decl. ¶ 7; <u>see also id.</u> ¶ 9.)

     6.      The Court agrees with Reiff's conclusion that Tinari has not "present[ed] a reliable methodology for determining damages to the class . . . such that plaintiffs can show that class-wide issues predominate over individual issues."  (Reiff Decl. ¶ 4.)

     7.      With respect to the distribution of potential damages to purported Class Members, Plaintiffs offer the suggestions of Joseph Fisher, a "settlement administrator" (Fisher Decl. ¶ 3; <u>see</u> Supp. Fisher Decl.; Tr.: Fisher at 118), who estimates that there were "between 4,650,000 and 6,522,000 retail consumers purchasing Del Monte Gold pineapples in 2004" (Supp. Fisher Decl. ¶ 6; <u>see</u> Pl. Findings at 20 ("the class is presently somewhat larger" than in 2004, "given increasing sales of Del Monte Gold Pineapples between 2004 and 2007, and the ongoing class period")).  Fisher proposes that the "possible modes of distributing relief to the class . . . could include [1] automatic price reductions on Del Monte Gold Pineapples by placing a coupon on the

hang tags attached to those pineapples, [2] a formal claims procedure in which class members could obtain coupons or cash relief, and [3] a cy pres distribution." (Supp. Fisher Decl. ¶ 24; see Pl. Findings at 12.)

8.      Each of Fisher's proposed methods of distributing damages is problematic.

9.      Specifically, Fisher "proposes that some of the relief obtained be allocated to 'automatic' coupons that would be placed on the hang tags of all Del Monte Gold Pineapples and would result in an automatic discount on the pineapple at the time of purchase." (Pl. Findings at 13 (citing Fisher Decl. ¶¶ 25-26; Supp. Fisher Decl. ¶ 8; Tr.: Fisher at 99-100).) He says "given that approximately 90% of all purchases of Del Monte Gold Pineapples are made by repeat purchasers . . . who buy pineapples at least once a month – and in many cases once a week – it is likely that current and future purchasers of Del Monte Gold Pineapples are the same persons who previously purchased those pineapples and were allegedly overcharged on those purchases, and can therefore be compensated through present price reductions for those pineapples." (Fisher Decl. ¶ 24.)

10.      Automatic price reductions are not, in this case, an effective or appropriate means of distributing damages to putative Class Members. First, because price reductions affect only future purchasers, "some people who were damaged . . . will not get compensated and some people that were not damaged . . . will be compensated." (Tr.: Fisher at 90-91; Supp. Fisher Decl. ¶ 26.) "'The people who are [currently] purchasing for the first time would not have suffered damages'" but would "still get the benefit" of the automatic discount. (Tr.: Fisher at 86-89; see Reiff Supp. Decl. ¶ 11.) Defendants offered persuasive testimony that the automatic discount program itself would attract and benefit new buyers who are not Class Members. (Tr.: Christou at 20; see Reiff Supp. Decl. ¶ 12; Fisher Deposition, dated Jan. 18, 2007 ("Fisher

Dep."), at 275.)  And, potential Class Members who "opted out" of the Class or participated in the formal claims administration process (see pages 14-16, infra) would be overcompensated if they purchased pineapples during the automatic discount period.  (Tr.: Fisher at 89.)  Fisher could not say what "percentage . . . would be overincluded" in an automatic discount program. (Tr.: Fisher at 100-01; see Fisher Dep. at 170-72, 175-76.)  And, the proposed automatic discount plan would be "under-inclusive" because, among other reasons, "[a] number of retail stores which once purchased Del Monte Gold pineapples no longer buy [them] or purchase only a minimal amount" and, instead, carry a competing brand.  (See Lazopoulos Decl. ¶¶ 1, 3-4; see also Reiff Supp. Decl. ¶ 13.)  Class Members who patronize those stores would not benefit from the automatic discount plan.  (Id.)

11.     Tinari's supplemental damages report, dated December 23, 2005, and Fisher's testimony assume that Del Monte Gold pineapples were competitively priced by no later than 2007, and that consumers who bought pineapples for the first time in 2007 (or thereafter) would not be members of the putative Class.  (Tinari Supp. Report at 8; Tr.: Fisher at 87-88.)  In their post-hearing brief, Plaintiffs assert that the Class Period is "ongoing" and would continue through the distribution of damages to the Class.  (Pl. Findings at 14-15.)  Even if the Class Period were ongoing, automatic discounts would still be "overinclusive" because "the damages award to class members will be in proportion to their consumption of Del Monte Gold pineapples in the future, rather than their consumption" in the past.  (Reiff Supp. Decl. ¶ 14.)

12.     Also, Plaintiffs' proposed automatic price reductions are not an effective means of distributing damages here because the data upon which Fisher bases his conclusions are unreliable.  As Fisher acknowledges, the efficacy of automatic discounts "hinges on" the (unproven) assertion that "approximately 90% of all purchases of Del Monte Gold Pineapples

are made by repeat purchasers." (Fisher Decl. ¶ 24; Tr.: Fisher at 48.) As Defendants point out (Def. Findings at 4-5), Fisher bases this assertion upon "a research paper prepared by [graduate student] David Neven for the Michigan State University Partnerships for Food Industry Development Fruits and Vegetables, entitled 'The United States Market for Fresh Pineapples'" ("Neven Article"). (Pl. Findings at 9-10 (citing Tr.: Fisher at 116; Fisher Decl. ¶¶ 8-13 & Ex. A; Supp. Fisher Decl. ¶ 6).) The Neven Article, in turn, relies upon a consumer survey published by a 2004 trade magazine, <u>The Packer</u>. (Fisher Decl. Ex. A: Neven Article at 4; Pl. Findings at 10.) Fisher did not review the "source data" for the survey published in <u>The Packer</u> (Tr.: Fisher at 55; <u>see id.</u> at 64 (Fisher did not "explore that data at all, . . . didn't test it, . . . didn't even look at it beyond what was quoted in the Neven article.")); Fisher did not "look[] at data before or after 2004," and does not "know whether those buying habits change" over time or would apply to the remainder of the Class Period (Tr.: Fisher at 56-57). Moreover, Fisher did not know that <u>The Packer</u> survey was based upon "a consumer panel" and not "the general population." (Tr.: Fisher at 55.)

       13.    Any automatic discount program, according to Fisher, would have to be supplemented by a formal "claims administration procedure." (Fisher Dep. at 275-76; Supp. Fisher Decl. ¶ 27.) "Fisher prepared an exemplar of a possible claim form to be used for this purpose, which asks questions to confirm membership in the class, inquires as to the number of pineapples purchased during the class period, and requires that the class member sign the form under penalty of perjury." (Pl. Findings at 15 (citing Supp. Fisher Decl. ¶ 19 & Ex. D).) The Court finds that Plaintiffs have not established that a substantial portion of the Class would receive (adequate) notice of such a claims program. Fisher proposes three notice methods. First, he asserts that Court-approved notice can be mailed or emailed to Class Members (Fisher Decl. ¶

14), although he acknowledges that Del Monte has addresses for a "very small percentage" – less than 1% – of the estimated Class (Tr.: Fisher at 77-80, 124; see Pl. Findings at 6-8). Second, Fisher recommends that claims be solicited through a "publication notice" program, but he does not state what portion of the Class such notice would reach. (Fisher Decl. ¶ 22.) Third, Fisher suggests (astonishingly, in the Court's view) "provid[ing] notice at the point of sale by placing a short-form notice . . . on the hang-tags that are affixed to Del Monte Gold Pineapples," and estimates that "[b]y placing these hang-tags . . . for a period of two to three months," notice could be effected to "many of the class members who are likely responsible for more than 90% of all retail purchases . . . ." (Fisher Decl. ¶¶ 19-20.) Fisher, however, acknowledges that he is not aware of any case where the legal notice was "[p]hysically attached to the product," in this case a pineapple, appropriately and effectively. (Tr.: Fisher at 127-29.) And, the efficacy of such a program relies upon the dubious proposition that consumers would read and comprehend a legal notice affixed to a pineapple (and upon Fisher's unproven assumption that "many members of the class are repeat purchasers"). (Supp. Fisher Decl. ¶ 11; see page 14, supra.)

14.     Even assuming, arguendo, that notice reached a substantial portion of the Class, the Court agrees with Defendants that Plaintiffs do not "have evidence showing what percentage of putative class members . . . would likely submit claims forms." (Def. Findings. at 16-17.) And, although Fisher acknowledges that over 99% of formal claims in this case would be payable in coupons, he is "not aware of any case other than settlement cases where" damages were distributed through coupons. (Tr.: Fisher at 98; see id. at 125-26 (Fisher is not "aware of any coupon cases that are not a settlement").)

15.     The Court also agrees with Defendants that claims are "likely to be of questionable reliability." (Def. Findings at 17.) For example, none of the named Plaintiffs

possesses receipts or other proof of purchases made during the Class Period, and Plaintiffs have offered no evidence that other Class Members possess such proof.  (See Pl. Findings at 15-17.) While Fisher's proposed claim form would require claimants to estimate the number of Del Monte Gold pineapples they purchased during the 12-year Class Period (Supp. Fisher Decl. Ex. D), even the named Plaintiffs appear unable to estimate the number (or brand) of past pineapple purchases they made with any degree of certainty (see, e.g., Deposition of Brenda Caldarelli, dated Aug. 23, 2005, at 30 (When asked what pineapple variety she purchased between 1996 and 2000, she replied: **"To be honest, it was so long ago, I don't remember exactly.  I really don't.  It was just too many years ago."**)).  Defendants offered persuasive testimony that consumers usually overestimate their purchases of well-known "legacy brands" such as Del Monte.  (Tr.: Christou at 21-22; see id. at 23-24 ("consumers self-reporting whether or not they purchased Del Monte gold pineapples . . . would lead to a significant overestimate").)  And, although Fisher acknowledged that a formal claims procedure would be "costly" to administer (Fisher Decl. ¶ 27), "Plaintiffs failed to provide any estimate of how much it would cost to administer such a system" (Def. Findings at 18).

16.     Fisher also proposes a cy pres distribution to "charitable organizations" "[t]o the extent there are funds left over after administration of an individual claims procedure . . . ." (Fisher Decl. ¶¶ 35-36.)  But Plaintiffs "have not shown why it would be appropriate to award a cy pres distribution . . . ."  (Def. Findings at 19.)  Nor have Plaintiffs estimated what percentage of damages would, under their proposed distribution scheme, be distributed through cy pres. (See Pl. Findings at 17-18, 28.)

**Manageability (Legal) Analysis**

The first three Rule 23(b)(3) factors do not strongly favor or disfavor certification of an

Indirect Purchaser Class. That is, "the interest of members of the class in individually controlling the prosecution or defense of separate actions," may favor certification because indirect purchasers are unlikely to sue for damages individually. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809 (1985). The existence of relevant pending litigation may not favor certification, because "to the extent plaintiffs pursue a class vehicle as a means of punishing defendants, preventing their retention of 'ill gotten gains,' or deterring future behavior, the existing [Direct Purchaser Class Action] may well serve those purposes." In re Phenylpropanolamine (PPA) Prods. Liab. Litig., 214 F.R.D. 614, 621 (W.D. Wash. 2003); accord Ren v. Philip Morris Inc., No. 00-004035, 2002 WL 1839983, at *18 (Mich. Cir. Ct. June 11, 2002). With respect to the third factor, "[t]he Indirect Purchasers . . . arguably selected the most desirable forum for a nationwide class action given that this court also serves as the MDL court for all federal [Del Monte pineapple] cases." Id. at 616.

Clearly, the fourth factor – "manageability" – is critical to the Rule 23(b)(3) analysis. That is, "[t]he administrative problems posed by this action will frustrate any effort to provide the individual class members with compensation for the alleged injuries." Eisen v. Carlisle & Jacquelin, 479 F.2d 1005, 1018 n.23 (2d Cir. 1973), vacated on other grounds, 417 U.S. 156 (1974); see id. at 1011-12 ("manageability . . . is the most important point in the case"); In re Hotel Telephone Charges, 500 F.2d 86, 90, 92 (9th Cir. 1974); In re PPA, 214 F.R.D. at 620-21; Barreras Ruiz v. Am. Tobacco Co., 180 F.R.D. 194, 199 (D.P.R. 1998). Manageability "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 164 (1974). Plaintiffs have failed to sustain their burden of establishing the manageability of the Indirect Purchaser Class for two "independently sufficient" reasons, In re Rezulin Prods. Liab. Litig., 224

F.R.D. 346, 353 (S.D.N.Y. 2004), namely (1) Plaintiffs did not "present a damages model that can be used on a class-wide basis based on common proof" (Def. Findings at 23-24); and (2) Plaintiffs did not present a reliable method of distributing damages to putative Class Members (id. at 30). See Pitt v. City of Portsmouth, Va., 221 F.R.D. 438, 446 (E.D. Va. 2004) ("An unmanageable class is an indication that individual issues predominate over common questions of law and fact and that there is a better method of adjudicating these issues.").

**Damages Model**

As noted, the Indirect Purchasers have not "present[ed] a reliable methodology for determining damages to the class . . . such that plaintiffs can show that class-wide issues predominate over individual issues" (see page 11, supra). See also In re Methionine Antitrust Litig., 204 F.R.D. 161, 165 (N.D. Cal. 2001) (Plaintiff's expert's "method assumes that there is a single pass-through rate for all direct and indirect resellers, yet [the expert] and plaintiff point to nothing in the record that suggests that such an assumption is valid."); A & M Supply Co. v. Microsoft Corp., 252 Mich. App. 580, 638-39, 654 N.W.2d 572, 602 (Mich. App. 2002) (plaintiffs' expert "did not describe a formula or method demonstrating that indirect purchasers were damaged, other than the assertion that the pass-on might be one hundred percent"). Among other things, "[t]he empirical analysis necessary to estimate a pass-through rate requires estimation of the relationship between wholesale price changes and retail price changes across time and location." (Reiff Supp. Decl. ¶ 6.) See McCarter v. Abbott Laboratories, Inc., No. Civ. A. 91-050, 1993 WL 13011463, at *3-6 (Ala. Cir. Ct. April 9, 1993) ("'the only way to get to the bottom of whether or not there was pass-on or not pass-on is to analyze store by store, price increase by price increase, year by year, exactly what was happening at the retail level'"). "The Court finds that, because of these individualized questions, certification of a class in this case

would not result in prompt, efficient judicial administration," but, "[r]ather, . . . would result in thousands of mini-trials, rendering this case unmanageable and unsuitable for class action treatment." McCarter, 1993 WL 13011463, at *5.[9]  In other words, because individual damages issues will predominate, a class action is not a "superior" method of adjudication under Fed.R.Civ.P. 23(b)(3) and the case is unmanageable.  See O'Connor v. Boeing North American, Inc., 180 F.R.D. 359, 383 (C.D. Cal. 1997) ("The inquiries surrounding predominance of common facts and superiority of the class action are intertwined.  The greater the number of individual issues, the less likely that a class action is the superior method of adjudication."); Moore's § 23.46[2][e][i].[10]

---

[9] Accord In re Brand Name Prescription Drugs Antitrust Litig., Nos. 94 C 897, MDL 997, 1994 WL 663590, at *7 (N.D. Ill. Nov. 18, 1994) ("tracing the alleged overcharges from manufacturers, to wholesalers, to retailers, to consumers presents individualized issues which would dominate this litigation and preclude certification under rule 23(b)(3)"); A & M Supply, 252 Mich. App. at 637-42, 654 N.W.2d at 601-04 ("this case has all the hallmarks of being unmanageable," as Plaintiffs' methodologies "will essentially require separate trials to determine the different pass-on rates affecting the class as a whole"); Execu-Tech Bus. Sys., Inc. v. Appleton Papers, Inc., 743 So.2d 19, 21-22 (Fla. Dist. Ct. App. 1999) (plaintiffs failed to offer a method "to show on a class-wide basis that a manufacturer-level price increase was passed through the distribution chain to impact each and every consumer"); Derzon v. Appleton Papers, Inc., No. 96-CV-3678, 1998 WL 1031504, at *8 (Wis. Cir. July 7, 1998) ("To step into this uncharted territory-certifying a class of geographically widespread indirect victims of price-fixing-the court needs something more than blind faith in the notion of regression analysis."); Karofsky v. Abbott Laboratories, No. CV-95-1009, 1997 WL 34504652, at *14-15 (Me. Super. Oct. 16, 1997) (finding indirect purchaser class action unmanageable: "The question of the amount, if any, of the pass through to the consumer cannot be addressed in a full and fair defense without the result that individualized facts and proof will predominate over questions common to the class.").

[10] Nor would the manageability problem be solved by bifurcating liability and damages. See McCarter, 1993 WL 13011463, at *6 (because "the 'fact of injury' element of liability is not capable of proof on a class-wide basis . . . , bifurcation would not 'remove or even alleviate the overwhelming burden of mini-trials'" (citation omitted)); Keating v. Philip Morris, Inc., 417 N.W.2d 132, 137-38 (Minn. App. 1987) ("lawsuit would remain unmanageable" even if bifurcated, because it "would still leave the problem of determining the fact and amount of damage for each [indirect purchaser]").

**Distribution of Damages**

The Court finds, independently, that "the problems inherent in ascertaining and distributing a damage award to countless consumers will make it impossible to administer the action and thereby negate any advantages gained by allowing the class allegations to stand." 7AA Wright, Miller & Kane, Federal Practice & Procedure § 1782 (3d ed. 2007). "It is readily apparent that no matter how easy it is to establish damages on a class level, if it is extremely difficult or almost impossible to distribute these sums to their rightful recipients, the class is unmanageable." City of Philadelphia v. American Oil Co., 53 F.R.D. 45, 72 (D.N.J. 1971); accord In re PPA, 214 F.R.D. at 620 (Adopting an aggregate approach to damages "would not serve to [lessen] the manageability problems plaguing the proposed class" because the court still would face "the daunting task of determining who could claim those damages in the first place.").

Plaintiffs (largely) rely upon automatic price discounts to distribute damages to individual Class Members, but Plaintiffs have failed to establish that such discounts would benefit injured Class Members. (See pages 12-14, supra.) "Fluid recovery refers to the distribution of unclaimed or unclaimable funds to persons not found to be injured but who have interests similar to those of the class." In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 525 (S.D.N.Y. 1996). The United States Court of Appeals for the Second Circuit has held that "no 'fluid recovery' procedures are authorized by the text or by any reasonable interpretation of amended Rule 23."[11] Eisen, 479 F.2d at 1008; see id. at 1018 ("We hold the

---

[11] See Eisen, 479 F.2d at 1010 ("As 'the class as a whole' will include all those who had purchased or sold in the period from mid-1962 to mid-1966 and all those who, at the time of assessing the full damages, were presently purchasing or selling, and those who might in the future purchase and sell, securities in lots of less than 100 shares, it is quite apparent that some of the original 6,000,000 claimants will receive nothing, because they have never heard of the case or for other reasons have failed to file claims and have them processed, and many other new traders, who had no transactions in the period from mid-1962 to mid-1966, will receive some

'fluid recovery' concept and practice to be illegal, inadmissible as a solution of the manageability problems of class actions and wholly improper."); accord Van Gemert v. Boeing Co., 553 F.2d 812, 815 (2d Cir. 1977) (stating that it saw "no reason to change [its] position, firmly stated in Eisen . . . , disallowing a 'fluid class' recovery"), aff'd on other grounds, 444 U.S. 472 (1980); Abrams v. Interco, Inc., 719 F.2d 23, 31 (2d Cir.1983) (finding that "'fluid' class recovery . . . has not found favor in this circuit").[12]

As noted, Plaintiffs' proposed "formal claims procedure" is also not a reliable method of distributing damages because: (i) Plaintiffs have not established what percentage of the Indirect Purchaser Class is likely to receive notice of the claims process (see page 15, supra), see also Abrams, 719 F.2d at 30 (affirming denial of class certification due to unmanageability of identifying and giving notice to putative class of shoe buyers); Eisen, 479 F.2d at 1017 ("Where there are millions of dispersed and unidentifiable members of the class notices by publication giving the essential information required by amended Rule 23 are a farce."); In re PPA, 214 F.R.D. at 617; Moore's § 23.46[2][e][i]; (ii) given the relatively small claims involved in terms of monetary value (and the proposed payment of claims in coupons), only a small percentage of

_____

payments."); see also State of N.Y. v. Dairylea Co-op. Inc., 547 F. Supp. 306, 308 (S.D.N.Y. 1982) ("this [coupon distribution] plan seems unfair to those actually injured for it makes no effort to specifically reimburse those who were allegedly overcharged in the past . . . but in effect is a payout to future milk drinkers in general"); City of Philadelphia, 53 F.R.D. at 72 ("The motorist who purchased gasoline from a retail station during the relevant period is still likely, if he has not moved out of the trading area, to continue his purchases of gasoline. However, he will be joined by many persons who were either not old enough to have had a driver's license or were not residing in the trading area between 1955 and 1965. Any fluid class recovery would be a windfall to them and a deprivation to the motorist entitled to recovery.").

[12] The Second Circuit has permitted fluid recovery under (limited) circumstances not present here. See State of N.Y. by Vacco v. Reebok Intern. Ltd., 96 F.3d 44, 46-49 (2d Cir. 1996) (settlement of statutory parens patriae action); In Re Agent Orange Prod. Liab. Litig., 818 F.2d 179, 185 (2nd Cir.1987) ("some 'fluidity' is permissible in the distribution of settlement proceeds").

Class Members would likely file claims (see page 15, supra), see also Eisen, 479 F.2d at 1010 ("it was not likely that a rush of claimants would eventuate no matter how extensive the publication"); (iii) many filed claims are not likely to be accurate or verifiable (see page 16, supra), see also In re PPA, 214 F.R.D. at 617-19 ("It is unrealistic to suppose that defendants will accept sworn oaths or affidavits under these circumstances."); City of Philadelphia, 53 F.R.D. at 72-73; Ludke v. Philip Morris Companies, Inc., No. MC 00-1954, 2001 WL 1673791, at *3 (Minn. Dist. Ct. Nov. 21, 2001) ("certification of the proposed class here would be an invitation for fraud"); and (iv) the cost of notice and claims administration (which Plaintiffs failed to estimate) might overwhelm any relatively minimal benefit to the Class, see, e.g., Eisen, 479 F.2d at 1010, 1017-18 ("it is fairly obvious that . . . the expenses of giving the notices . . . and the general costs of administration of the action would exceed the amount due to the few members of the class who filed claims"); accord Reebok, 96 F.3d at 49; In re PPA, 214 F.R.D. at 621; State of N.Y. ex rel. Koppell v. Keds Corp., 1994 WL 97201, at *3 (S.D.N.Y. March 21, 1994).[13]

And, there is no appropriate basis or rationale for the Court to distribute a substantial portion of damages cy pres to unrelated "charitable organizations." See Jones v. National Distillers, 56 F. Supp. 2d 355, 357 (S.D.N.Y. 1999) ("Distributing class funds outside the class is permissible where the funds 'primarily' benefit class members, especially where the non-class distribution is not an initial purpose of the fund, but only an eventual way to dispose of the unclaimed portion . . . .").

---

[13] See Green v. McNeil Nutritionals, LLC, No. 2004-0379-CA, 2005 WL 3388158, at *10 (Fla. Cir. Ct. Nov. 16, 2005); Ren v. Philip Morris Inc., No. 00-004035, 2002 WL 1839983, at *15 (Mich. Cir. Ct. June 11, 2002); Sias v. Edge Communs. Inc., 8 P.3d 182, 185-189 (Okla. Civ. App. 2000); McCarter, 1993 WL 13011463, at *5; Hayna v. Arby's, Inc., 99 Ill. App.3d 700, 55 Ill. Dec. 1, 425 N.E.2d 1174, 1183-84 (Ill. App. Ct. 1981).

**Injunctive Relief**

Plaintiffs argue in a footnote to their post-hearing brief that "Del Monte has not opposed certification of the class to pursue injunctive relief under Section 2 of the Sherman Act or the state antitrust and unfair competition statutes under which the Plaintiffs assert claims." (Pl. Findings at 1 n.3.)  Defendants respond that "Plaintiffs did not move for certification of a class for injunctive relief and no such class should be certified." (Def. Findings at 20 n.7.)

The Court denies certification of an Indirect Purchaser Class seeking only injunctive relief. For one thing, Plaintiffs failed to move for such relief under Fed.R.Civ.P. 23(b)(2). (See Pl. Cert. Mem. at 11, 35-36.)  And, the Court is certifying a Class of Direct Purchasers who seek injunctive relief and "are the class of individuals who are more directly injured by the [alleged] antitrust activities and in a better position to prosecute a claim based upon that activity; in fact, they have done so." Strang v. Visa U.S.A., Inc., No. 03 CV 011323, 2005 WL 1403769, at *4 (Wis. Cir. Feb. 8, 2005). A "'significant antitrust violation [has not been] undetected or unremedied.'" Id.; see In re Northwest Airlines Corp., 208 F.R.D. 174, 226 (E.D. Mich. 2002) ("where the questions of liability significantly overlap, and indeed appear to be virtually identical, it would disserve judicial economy to certify separate 'injunction' and 'damage' classes").

## IV.    Conclusion and Order

For the foregoing reasons, Plaintiffs' motions [34, 39] for class certification pursuant to Fed.R.Civ.P. 23 are granted with respect to the Direct Purchasers' Sherman Act Claims, and denied with respect to the Direct Purchasers' unjust enrichment claims and all of the Indirect Purchasers' claims.

Counsel are requested to appear at a status/settlement conference with the Court on

March 3, 2008, at 3:00 p.m., in Courtroom 21-D, 500 Pearl Street, New York, New York.  **The Court directs the parties to engage in good faith settlement negotiations prior to the conference with the Court.**

Dated: New York, New York
        February 20, 2008

*RMB*

_____

**RICHARD M. BERMAN, U.S.D.J.**