

DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/30/09

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

IN RE FRESH DEL MONTE PINEAPPLES    :
ANTITRUST LITIGATION.    :

-------------------------------------------------------------x

This document relates to all actions    :

-------------------------------------------------------------x

No. 04-md-1628 (RMB) (MHD)

**DECISION & ORDER**

I.    **Introduction**

On August 18, 2004, a Consolidated Direct Purchaser and Indirect Purchaser Class

Action complaint ("Complaint") was filed against Del Monte Fresh Produce Company and Del

Monte Fresh Produce, N.A., Inc. ("Del Monte" or "Defendants"), on behalf of all those who

purchased "Fresh Del Monte Gold" pineapples ("Plaintiffs") in the United States from March 1,

1996 to the present ("Class Period"). (Compl. ¶¶ 14, 15, 98, 105.) Plaintiffs allege that, during

the Class Period, Del Monte "improperly obtained and maintained a monopoly over the

propagation, marketing, and sale of fresh, whole, extra-sweet pineapple . . . by: (i) securing a

patent, through the prosecution of a fraudulent patent application with the United States Patent

and Trademark Office ('PTO') for a pineapple variety it knew, and has now admitted, was

unpatentable . . . ; (ii) issuing intentionally false and misleading letters [so-called 'Threat

Letters'] to competitors and others stating that the Fresh Del Monte Gold™ pineapple [also

known as the 'MD-2' pineapple] was patented by Defendants and threatening litigation if they

engage in the propagation, marketing, or sale of that pineapple . . . ; [and] (iii) commencing and

pursuing sham patent litigation in order to foreclose competition in the fresh, whole, extra-sweet

pineapple market . . . ." (Id. ¶ 3.) According to Plaintiffs, "Defendants used their unlawfully

obtained monopoly power to charge supracompetitive prices for the Gold pineapples, thereby

causing both direct and indirect purchasers of the Gold pineapples to sustain injury to their

business and property." (Id. ¶ 12.)

On or about July 29, 2008, Plaintiffs informed Defendants that they "hereby withdraw" the fraud on the PTO claim described at (i) above. (Del Monte's Statement of Material Facts in Supp. of Mot. for Summ. J., dated Aug. 8, 2008 ("Defs. 56.1"), ¶ 164 (citation omitted); Direct and Indirect Purchaser Pls.' Opp'n to Del Monte's Statement of Material Facts in Supp. of Mot. for Summ. J., dated Oct. 6, 2008 ("Pls. 56.1"), ¶ 164.)

Plaintiffs include both Direct Purchasers, i.e., all those who purchased Fresh Del Monte Gold pineapples directly from Del Monte (such as retailers IGA, Publix Super Markets, and Whole Foods Market), and Indirect Purchasers, including "consumers, the last persons . . . in the chain of distribution" who purchased such pineapples. (Compl. ¶¶ 14–15.) In the Complaint, the Direct Purchasers assert claims of monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2; and common law claims for "restitution/disgorgement/unjust enrichment" ("unjust enrichment claims") under the laws of the 50 states and the District of Columbia. (Id. ¶¶ 113–39.) The Indirect Purchasers assert claims of monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2; unjust enrichment claims under state law; claims for damages under state anti-monopoly statutes; and state consumer protection law claims for restitution and/or damages. (Id. ¶¶ 113–31, 137–212.)[1]

On February 20, 2008, the Court granted Plaintiffs' motion, dated June 29, 2005, for class certification but only with respect to the Direct Purchasers' claims under the Sherman Act. See In re Fresh Del Monte Pineapples Antitrust Litig., No. 04-md-1628, 2008 WL 5561873, at *11 (S.D.N.Y. Feb. 20, 2008) (Direct Purchasers "meet the criteria" of Fed. R. Civ. P. 23(a) and 23(b)(3)). At the same time, the Court denied class certification with respect to the Indirect Purchasers' claims. See id. at *9 ("Plaintiffs have failed to sustain their burden of establishing

---

[1]    With respect to the Sherman Act claims, the Direct Purchasers seek injunctive relief and (treble) damages, while the Indirect Purchases seek only injunctive relief. (Id. ¶ 131.)

the manageability of the Indirect Purchaser Class for two independently sufficient reasons, namely [i] Plaintiffs did not present a damages model that can be used on a class-wide basis based on common proof; and [ii] Plaintiffs did not present a reliable method of distributing damages to putative Class Members.") (internal quotations and citations omitted).  By separate order issued the same day, the Court granted Defendants' motion, dated May 27, 2005, to dismiss the Direct Purchasers' unjust enrichment claims. (See Order, dated Feb. 20, 2008 ("February 20, 2008 Order"), at 4 ("It is well settled that a claim in quasi contract does not lie where, as here, there is a valid contract between the parties respecting the matter at issue.") (internal quotations and citations omitted).)[2]

On August 8, 2008, Defendants moved pursuant to Rule 702 of the Federal Rules of Evidence ("Fed. R. Evid.") to exclude the proposed expert testimony of Ronald W. Cotterill, Ph.D., George M. Gould, Esq., and Frank D. Tinari, Ph.D., and pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") for summary judgment on Plaintiffs' Sherman Act claims arguing, among other things, that:  (1) Dr. Cotterill's proposed testimony regarding the product market is not supported by a "standard, accepted methodology" and "there is no competent, admissible evidence to support [P]laintiffs' claimed relevant product market consisting of a single product, the MD-2 [pineapple] marketed by Del Monte as the Del Monte

---

[2]    The Court denied as moot Defendants' motion to dismiss the Indirect Purchasers' state law claims. (See Feb. 20, 2008 Order at 5 ("Because, in a separate Order issued simultaneously herewith, the Court denies certification of a class of Indirect Purchasers under Fed. R. Civ. P. 23, this aspect of Defendants' motion is denied as moot.").)

Five individual Indirect Purchasers remain in the case:  (i) Brenda Caldarelli, "a resident of Los Angeles County, California"; (ii) Alberta Lopez, "a resident of Los Angeles County, California"; (iii) Carrie Pardy, "a resident of Los Angeles County, California"; (iv) Gary Freed, "a resident of Monmouth County, New Jersey"; and (v) Neil Schwam, "a resident of New York County, New York."  (See Compl. ¶¶ 24–28.)

Gold pineapple"; (2) Mr. Gould's proposed testimony regarding Del Monte's alleged "sham" litigation and patent misuse is "irrelevant" and "inadmissible" and Plaintiffs' claims of "sham" litigation are "insupportable"; (3) "Dr. Cotterill's [proposed] testimony concerning alleged delays in competitors' entry into the market is not based on any economic analysis" and "there is no credible and admissible evidence that Del Monte's alleged wrongful conduct had any actual effect on pineapple production by competitors"; (4) the so-called Threat Letters "did not constitute wrongful anticompetitive conduct" because "Del Monte indisputably had a legitimate business interest" in sending them; and (5) Dr. Cotterill's proposed "expert opinion on damages is methodologically flawed" and Plaintiffs thus have "no evidence of damages." (Del Monte's Mem. in Supp. of Summ. J. and Exclusion of Expert Evid., dated Aug. 8, 2008 ("Defs. Mem."), at 3–4, 7, 12, 18, 21, 38.)[3]

On October 6, 2008, Plaintiffs filed an opposition arguing, among other things, that: (1) there is no basis to exclude Dr. Cotterill's opinions as to the product market and "the MD-2 product market is supported by competent, admissible evidence"; (2) "Mr. Gould's patent testimony is admissible" and there is evidence that Del Monte filed "sham" lawsuits against Dole Food Company ("Dole") and Maui Land & Pineapple, Co. ("Maui") "to keep these competitors out of the MD-2 market"; (3) Dr. Cotterill's testimony falls "within an agricultural economist's realm of expertise and would assist the trier of fact," and "[t]here is more than adequate evidence to establish questions of material fact with regard to whether Del Monte's conduct slowed its competitors' market entry and deterred competition"; (4) Del Monte had "no legitimate reason to reference the CO-2 [P]atent in the [T]hreat [L]etters"; and (5) Defendants' arguments

---

[3]     Defendants also argue that "Dr. Tinari's proposed damage[s] testimony should be excluded for the reasons set forth in the Court's Order of February 20, 2008 denying class certification" and that "Del Monte is entitled to summary judgment against the individual [I]ndirect [P]urchasers for the [same] reasons set forth . . . above." (Defs. Mem. at 44.)

4

"mischaracterize Dr. Cotterill's damages analysis" and, in any event, "it has been established law for over 75 years that plaintiffs are not required to quantify their antitrust overcharge damages with any exactitude." (Direct and Indirect Purchaser Pls. Joint Opp'n to Defs. Mot. for Summ. J. and Exclusion of Expert Testimony, dated Oct. 6, 2008 ("Pls. Opp'n"), at 8, 10, 17, 19, 31, 35, 39, 41 (emphasis omitted).)

On December 8, 2008, Defendants filed a reply. (See Del Monte's Reply in Supp. of Mot. for Summ. J. and Exclusion of Expert Testimony, dated Dec. 8, 2008 ("Defs. Reply").) Plaintiffs declined to file a sur-reply. (See Ltr. from Michael M. Buchman to Hon. Richard M. Berman, dated Jan. 8, 2009.)

On July 27, 2009, the Court held a hearing at which Dr. Cotterill, the Direct Purchasers' principal expert, testified concerning his expert report, dated January 4, 2006, under Fed. R. Civ. P. 702 and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993) ("Daubert Hearing"). (See Expert Report of Ronald W. Cotterill, Ph.D., dated Jan. 4, 2006 ("Cotterill Report"); see also Order, dated July 24, 2009; Transcript of Proceedings, dated July 27, 2009 ("Hr'g Tr."), at 2–50.)[4] The Court also heard oral argument on the merits of Defendants' summary judgment motion. (See Hr'g Tr. at 50–68.)

**For the reasons set forth below, Defendants' motion to exclude expert testimony and for summary judgment is granted.**

## II.    Background

In 1973, the Pineapple Research Institute of Hawaii ("PRI"), "a voluntary research cooperative among competing pineapple growers, including Del Monte, Dole . . ., and Maui,"

---

[4]    The Daubert Hearing included the cross-examination and redirect examination of Dr. Cotterill, as Plaintiffs had submitted Dr. Cotterill's expert report in lieu of his direct testimony. It also included oral argument by counsel for the Direct Purchasers, Michael M. Buchman, J. Douglas Richard, and counsel for Del Monte, David A. Barrett, and Carlos Sires.

assigned the identification number 73-114 to "the plant material that later came to be known as [the Del Monte] MD-2" pineapple. (Defs. 56.1 ¶ 1, 2; Pls. 56.1 ¶ 1, 2.) "The PRI released the 73-114 to its members in 1981," who at that time "were Del Monte and Maui." (Defs. 56.1 ¶ 6; Pls. 56.1 ¶ 6.)

"After receiving the [73-114] plant material from the PRI, Del Monte's scientists and others in Del Monte's pineapple operations conducted experiments for nearly a decade and a half on the variety, developed an agronomy program for it, and tested the new variety to determine whether it would be suitable for commercialization. Del Monte named the variety the MD-2." (Defs. 56.1 ¶ 9; Pls. 56.1 ¶ 9.) "The MD-2 is known for its sweet taste, high Vitamin C content, and its golden yellow high shell color." (Defs. 56.1 ¶ 10; Pls. 56.1 ¶ 10.) "Del Monte formally launched the MD-2 under its Del Monte Gold Extra Sweet brand in North America in May 1996." (Defs. 56.1 ¶ 12; Pls. 56.1 ¶ 12.)

"At the time of Del Monte's launch of the Del Monte Gold [b]rand in 1996, Dole sold champaka ['Champaka pineapples'] and," according to Defendants, so-called "cayenne variety pineapples." (Defs. 56.1 ¶ 14; Pls. 56.1 ¶ 14.) And, in or about 2000, "Dole sold in interstate commerce a variety of pineapple that is 'sweet in taste,' 'high in Vitamin C,' and 'distinguished by its golden-yellow high shell color," which, according to Defendants, include "[t]he MG-1 (Mayan Gold 1)" pineapple and the MG-3 pineapple. (Defs. 56.1 ¶¶ 15, 16 (citations omitted); Pls. 56.1 ¶¶ 15, 16.) The MG-3 pineapple is Dole's version of the Del Monte MD-2 pineapple. (See Defs. 56.1 ¶ 24 ("Dole sometimes referred to the MD-2 as the MG-3."); Pls. 56.1 ¶ 24.)

Maui sells a pineapple known by the PRI identification number 73-50. (See Defs. 56.1 ¶ 28; Pls. 56.1 ¶ 28.) "Del Monte refers to the pineapples grown from the 73-50 plant material as the CO-2." (Defs. 56.1 ¶ 30; Pls. 56.1 ¶ 30.) "The CO-2 (73-50) and the MD-2 (73-114) were

6

siblings from the same genetic cross made at the PRI." (Defs. 56.1 ¶ 29; Pls. 56.1 ¶ 29.) "As siblings, the CO-2 and the MD-2 share certain key traits: [high] shell color, [yellow] flesh color, high Vitamin C content, and sweet flavor." (Defs. 56.1 ¶ 32; Pls. 56.1 ¶ 32.)

Plaintiffs allege, among other things, that unlike the MD-2 variety, both the MG-1 and CO-2 are "sweet," but not "extra sweet," pineapples and that they were sold in limited quantities and in limited geographic areas during the Class Period. (See Pls. 56.1 ¶¶ 17, 21, 23, 31, 33.)

On or about August 23, 1993, Del Monte applied for a patent on the CO-2 pineapple, and, on or about August 16, 1994, the PTO issued to Del Monte United States Plant Patent No. 8,863 ("CO-2 Patent"). (See Defs. 56.1 ¶ 165; Pls. 56.1 ¶ 165; see also Decl. of Carl E. Goldfarb, dated Aug. 8, 2008 ("Goldfarb Decl."), Ex. 77.)

In 1995, Del Monte sent five letters signed by Daniel Funk, a former Vice President of Research & Development at Del Monte, "to Costa Rican laboratories involved in the propagation of MD-2 pineapple seeds." (Defs. 56.1 ¶ 35; see also Pls. 56.1 ¶ 35.) The letters, which as noted above are referred to in this litigation as "Threat Letters," vary somewhat and "advised the laboratories that Del Monte's MD-2 plant material was being stolen, that Del Monte developed the MD-2 variety, and that Del Monte also held the patent numbered 8,863." (Defs. 56.1 ¶ 37; see also Pls. 56.1 ¶ 37.) For example, the March 23, 1995 letter from Mr. Funk to Mr. Oscar Arias of the Agri Biotecnologia de Costa Rica states:

> Del Monte Fresh Product Company is aware that your company has acquired pineapple plant material and is researching the growth and production of pineapple plants. Del Monte has also learned of an organized effort to steal this planting material from the Del Monte plantation for propagation purposes.
>
> Be advised that Del Monte is the developer of this plant material and intends to protect its interests as necessary. In addition, be advised that Del Monte owns U.S. Patent No. Plant 8,863, dated August 16, 1994. Please govern yourself accordingly.

(Goldfarb Decl. Ex. 79.) The March 23, 1995 letter to Mr. Arias "was [also] sent to and received by Dole," although there is no indication that Del Monte sent the letter to Dole. (Pls. 56.1 ¶ 35; see also Goldfarb Decl. Ex. 80.)

In or about March 2000, Del Monte filed a four-count litigation for misappropriation of trade secrets, conversion, reverse palming off under the Lanham Act, and violation of Florida's Deceptive and Unfair Trade Practices Act against Dole in the United States District Court for the Southern District of Florida ("Dole Action"). (Defs. 56.1 ¶ 68; Pls. 56.1 ¶ 68.) Del Monte alleged, among other things, that "Dole first propagated MD-2 pineapples with the progeny of plant material stolen from Del Monte and then misled the market by claiming that it, Dole, had developed a new pineapple variety," and that Dole misappropriated "Del Monte's agronomy and agricultural protocols for growing the MD-2 variety." (Defs. 56.1 ¶ 68; Pls. 56.1 ¶ 68 (internal quotations and citations omitted).)[5] The parties settled the Dole Action prior to trial and under the settlement "Dole paid Del Monte $1.5 million and agreed it would never again, anywhere in the world, market its MG-3 pineapple (which was grown from MD-2 plant material) as a 'new variety.'" (Defs. 56.1 ¶ 74 (citation omitted); Pls. 56.1 ¶ 74.)

In April 2001, Maui sued Del Monte in United States District Court for the Northern District of California asserting "trademark infringement" of Maui's "Hawaiian Gold" mark ("Maui Action"). (Defs. 56.1 ¶ 88; Pls. 56.1 ¶ 88; see also Goldfarb Decl. Ex. 134.) Del Monte asserted a counterclaim against Maui alleging infringement of the CO-2 Patent.[6] On or about

---

[5]    Plaintiffs in the instant case allege that Del Monte knew, prior to the filing of the Dole Action, that MD-2 plant material "was legally available in the marketplace and Del Monte had given its planting material away as gifts." (Pls. 56.1 ¶ 72.)

[6]    Plaintiffs in the instant case allege that Del Monte was on notice prior to filing the patent infringement counterclaim in the Maui Action that the CO-2 patent was invalid based upon, among other things, Maui's sales of CO-2 pineapples as far back as 1973. (See Defs. 56.1 ¶¶

January 31, 2003, Del Monte moved to dismiss its patent infringement counterclaim with

prejudice because, according to Del Monte, it "learned through discovery that Maui had sold

CO-2 pineapples more than one year before Del Monte applied for the [CO-2] [P]atent" and

"Maui's pre-patent sales invalidate Del Monte's [CO-2] [P]atent." (Goldfarb Decl. Ex. 143 at 2–

3; see also Defs. 56.1 ¶ 92; Pls. 56.1 ¶ 92.) On or about April 4, 2003, the court granted Del

Monte's motion and dismissed the patent infringement counterclaim. (See Dkt. [#308] in Maui

Pineapple Co. Ltd. et al v. Del Monte Corp., et al., No. 01 Civ. 1449 (N.D. Cal. 2003).)    On or

about September 8, 2003, the parties entered into a settlement agreement, and, on or about

October 2, 2003, the court dismissed the Maui Action with prejudice. (See Dkt. [#328] and

[#329] in Maui Pineapple Co. Ltd. et al v. Del Monte Corp., et al., No. 01 Civ. 1449 (N.D. Cal.

2003).)

**III.    Legal Standard**

    Fed. R. Evid. 702 "provides that expert testimony concerning technical or specialized

knowledge is admissible to assist the trier of fact if '[i] the testimony is based upon sufficient

facts or data, [ii] the testimony is the product of reliable principles and methods, and [iii] the

witness has applied the principles and methods reliably to the facts of the case.'" In re Wireless

Tel. Servs. Antitrust Litig., 385 F. Supp. 2d 403, 427 (S.D.N.Y. 2005) (quoting Fed. R. Evid.

702). The Fed. R. Evid. 702 "standard incorporates the principles enunciated in [Daubert] in

which the Supreme Court held that trial courts have a gatekeeping function to ensure that any

and all scientific testimony or evidence admitted is not only relevant but reliable." Discover Fin.

Servs. v. Visa U.S.A., Inc., 582 F. Supp. 2d 501, 503 (S.D.N.Y. 2008) (internal quotations

omitted); see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999). "The focus

---

80–81, 90–92; Pls. 56.1 ¶¶ 80–81, 90–92.)

[of the admissibility inquiry] . . . must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. "The proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence." Aventis Envt'l Science USA LP v. Scotts Co., 383 F. Supp. 2d 488, 513 (S.D.N.Y. 2005).

"Summary judgment is appropriate when the pleadings and admissible evidence proffered to the district court show that there is 'no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). "In the context of antitrust cases . . . summary judgment is particularly favored because of the concern that protracted litigation will chill pro-competitive market forces." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 104 (2d Cir. 2002) (per curiam). The moving party bears the burden of informing the district court of the basis for its motion. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "When the moving party meets this burden, the burden shifts to the nonmoving party to come forward with 'specific facts showing that there is a genuine issue for trial.'" PepsiCo, Inc., 315 F.3d at 104 (quoting Fed. R. Civ. P. 56(e)). "In determining whether the moving party is entitled to judgment as a matter of law, the court must resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." Major League Baseball, 542 F.3d at 309 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

"[I]n order to state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must establish [i] the possession of monopoly power in the relevant market and [ii] the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." PepsiCo, Inc., 315

10

F.3d at 105.[7]  With regard to the first element, "[i]n the absence of direct measurements of a

defendant's ability to control prices or exclude competition . . . market power necessarily must

be determined by reference to the 'area of effective competition' – which, in turn, is determined

by reference to a specific, defined 'product market.'" Id. at 109.  The second element requires a

plaintiff to prove that the defendant used or attempted to use monopoly power to foreclose

competition, to gain a competitive advantage, or to destroy a competitor.  See Clorox Co. v.

Winthrop, 836 F. Supp. 983, 993 (E.D.N.Y. 1993) (internal quotations and citation omitted); see

also U.S. v. Microsoft Corp., 253 F.3d 34, 58 (D.C. Cir. 2001); Trans Sport, Inc. v. Starter

Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992).  "[E]ven if a company exerts monopoly

power, it may defend its practices by establishing a business justification." U.S. v. Dentsply

Int'l., Inc., 399 F.3d 181, 191 (3d Cir. 2005); see also Microsoft, 253 F.3d at 59.

## IV.    Analysis

### (1)    Product Market

#### Expert Testimony

Defendants argue, among other things, that Dr. Cotterill did not employ a "standard,

accepted methodology" in defining the product market; that he "excluded from the product

market the MG-1 and CO-2 pineapples[,] both extra-sweet varieties" based upon "a series of

factual assumptions that are belied by the undisputed factual record"; and that he did not conduct

a proper analysis of the product market under the United States Department of Justice and

---

[7]    "To demonstrate an attempted monopolization claim under Section 2, a plaintiff must establish:  [i] that the defendant has engaged in predatory or anticompetitive conduct with [ii] a specific intent to monopolize and [iii] a dangerous probability of achieving monopoly power." Aventis, 383 F. Supp. 2d at 503 (internal quotations and citation omitted).  "Both monopolization and attempted monopolization claims require anticompetitive behavior by the defendant." Dresses for Less, Inc. v. CIT Group/Commercial Servs., Inc., No. 01 Civ. 2669, 2002 WL 31164482, at *12 (S.D.N.Y. Sept. 30, 2002).

Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines") by failing, for

example, to analyze cross-elasticity of demand between the MD-2 pineapple and potential

substitutes. (Defs. Mem. at 21, 26, 27.)[8]  Plaintiffs counter that Dr. Cotterill's methodology is

reliable because, among other reasons, his analysis has "evidentiary support" and "cannot be

rejected under <u>Daubert</u> merely because a few tidbits of evidence suggest a different view of the

facts." (Pls. Opp'n at 26, 28.)   And, Plaintiffs contend that Dr. Cotterill "conducted precisely

the sort of 'small but significant increase in price' (SSNIP) analysis called for under the [Merger

Guidelines]." (Pls. Opp'n at 20.)

     "In the absence of direct measurements of a defendant's ability to control prices or

exclude competition . . . market power necessarily must be determined by reference to the 'area

of effective competition' – which, in turn, is determined by reference to a specific, defined

'product market.'" <u>PepsiCo, Inc.</u>, 315 F.3d at 108; <u>see also</u> <u>Emigra Group, LLC v. Fragomen,</u>

<u>Del Rey, Bernsen & Loewy, LLP</u>, 612 F. Supp. 2d 330, 351 (S.D.N.Y. 2009).[9]  "The reasonable

interchangeability of use or the cross-elasticity of demand between the product itself and

substitutes for it determine the outer boundaries of a product market." <u>Chapman v. New York</u>

<u>State Div. for Youth</u>, 546 F.3d 230, 238 (2d Cir. 2008) (internal quotations and citations

---

[8]     "For purposes of summary judgment, Del Monte does not address whether the Champaka
pineapple also should be included in the relevant product market. . . ." (Defs. Mem. at 21 n.24.)

[9]     Plaintiffs argue unpersuasively that establishing a relevant product market is unnecessary
because Del Monte "achieved a huge operating profit to sales ratio, 63.5%[,] in its Gold business
unit." (Pls. Opp'n at 20 & n.26; <u>see</u> Cotterill Report App. A.)  <u>But see</u> <u>Meijer, Inc. v. Barr</u>
<u>Pharm., Inc.</u>, 572 F. Supp. 2d 38, (D.D.C. 2008) ("Plaintiffs fail to cite a single case (and the
Court is aware of none) where a court has allowed the use of direct evidence of market power to
define a product market."); <u>Re/Max Int'l, Inc. v. Realty One, Inc.</u>, 173 F.3d 995, 1019 (6th Cir.
1999) (a plaintiff must set forth "unambiguous evidence that a defendant can control prices or
exclude competition"); <u>In re Remeron Direct Purchaser Antitrust Litig.</u>, 367 F. Supp. 2d 675,
683 (D.N.J. 2005).

omitted).  "Like any other issue, market definition is subject to summary judgment if the

plaintiffs fail to provide sufficient evidence from which a jury could reasonably find in their

favor."  Bathke v. Casey's Gen. Stores, Inc., 64 F.3d 340, 345 (8th Cir. 1995).

 Dr. Cotterill very narrowly concluded that the "relevant antitrust market" is limited to

"fresh Gold pineapples in North America," (Cotterill Report at 12; see also Compl. ¶ 95), which

he defined as the MD-2 pineapple only.[10]  (See Cotterill Report at 5; Hr'g Tr. at 4 ("Q:  And the

MD-2 is the only product which is in the product market that you have defined and are

advocating in this case; is that correct?  A:  Yes.").))[11]  In fact, Dr. Cotterill relies upon a single

brand market, i.e., Del Monte's MD-2 pineapple, during the first four years of the Class Period.

See Apple, Inc. v. Psystar Corp., 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) ("Single-brand

markets are, at a minimum, extremely rare."); (see also Defs. Reply at 9.)

 The Court is excluding Dr. Cotterill's testimony on the relevant product market because,

among other reasons, of its insufficient factual basis and its unreliability, i.e., his methodology

does not consider meaningfully whether the MG-1 and CO-2 pineapples, among other products,

are reasonable substitutes for the MD-2.  See Corey Airport Servs., Inc. v. City of Atlanta, No.

---

[10] Fed. R. Evid. 702 "requires a trial court to make an initial determination as to whether the
proposed witness qualifies as an expert."  Aventis Envtl., 383 F. Supp. 2d at 513.  Dr. Cotterill is
qualified as an expert witness in the field of agricultural economics given his education,
experience and general knowledge of the subject matter.  See Discover Fin. Servs., 582 F. Supp.
2d at 503 n.3; (see also Cotterill Report Ex. 1; Decl. of Carl E. Goldfarb, dated Aug. 8, 2008
("Goldfarb Decl."), Ex. 2 at 24–30; Hr'g Tr. at 21–22); Delco LLC v. Giant of Maryland, LLC,
No. 07 Civ. 3522, 2007 WL 3307018, at *3 & n.3 (D.N.J. Nov. 8, 2007) ("Dr. Cotterill is the
Director of the Food Marketing Policy Center and a Professor of Agricultural Economics at the
University of Connecticut"; he "has a joint Ph.D. in economics and agricultural economics from
the University of Wisconsin-Madison"; and he "has 30 years of experience analyzing antitrust
issues in food markets").

[11] For purposes of the product market analysis, the Court is using the term "MD-2" to refer
to "fresh Gold pineapples in North America."

04 Civ. 3243, 2008 WL 4452386, at *41 (N.D. Ga. Sept. 30, 2008) (expert "failed to meaningfully consider whether there were any substitute products"); Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing, Inc., No. 05 Civ. 138, 2008 WL 113987, at *4 & n.4 (E.D. Ky. 2008) (expert "considered only the Busch NASCAR race as a possible substitution for a NEXTEL race"); Virginia Vermiculite Ltd. v. W.R. Grace & Co.-Conn., 98 F. Supp. 2d 729, 737 (W.D. Va. 2000) (expert "in his market analysis, did not thoroughly examine substitutes when defining the market"); see also Bailey v. Allgas, Inc., 148 F. Supp. 2d 1222, 1235–36 (S.D. Ala. 2000), aff'd 284 F.3d 1237 (11th Cir. 2002).

While Dr. Cotterill identified "an unusually rich set of facts that go to product market definition," (Cotterill Report at 6), Dr. Cotterill's Report "quickly dismissed the [MG-1 and CO-2] as reasonable substitutes for [the MD-2]," Bailey, 284 F.3d at 1247, and did so based upon scant evidence, namely a 1998 Dole consumer taste test reflecting a preference for the MD-2 over the MG-1 and a few excerpts of deposition testimony from Dole and Del Monte employees. (See Cotterill Report at 7–8); Schwab v. Philip Morris USA, Inc., 449 F. Supp. 2d 992, 1136 (E.D.N.Y. 2006) ("Expert opinions based on insufficient facts or data [are] not acceptable."); see also McLaughlin Equip. Co., Inc. v. Servaas, No. 98 Civ. 127, 2004 WL 1629603, at *7 (S.D. Ind. Feb. 18, 2004). And, there is no indication that Dr. Cotterill's review is sufficiently reliable for antitrust purposes. See Berlyn, Inc. v. Gazette Newspapers, Inc., 214 F. Supp. 2d 530, 539 (D. Md. 2002) ("To the extent that Shaffer relied on market research done by defendants or statements by the defendants regarding their perceptions of competition, market, and the like, there is no indication that these assessments were based on proper research methods.").

Dr. Cotterill's analysis overlooks relevant facts which show that the MG-1 and CO-2 pineapples are, indeed, reasonable substitutes for the MD-2. See Concord Boat Corp. v.

14

Brunswick Corp., 207 F.3d 1039, 1056 (8th Cir. 2000).  For example, the record includes

substantial evidence that Dole's MG-1 and Maui's CO-2 pineapples were sold in direct

competition with Del Monte's MD-2 pineapple.  (See, e.g., Goldfarb Decl. Ex. 36 at 157, 159

("50 percent of Maui's pineapple sales have been of the CO-2 variety," with some sales

occurring "in the same geographic area" as Del Monte's MD-2); Ex. 98 at 6 (Maui "is

realistically seeking a ten percent (10%) share of the . . . market by promoting our [CO-2]

pineapple."); Ex. 60 at 95–96 (MG-1 was sold "commercially in competition with the MD-2");

Ex. 61 at 38, 127–28 (MG-1 "seems to be very competitive," occupied "close to 100 percent" of

Dole's Hawaii plantation as of 2001, and was sold along with the MD-2 under the "Premium

Select" label); Buchman Decl. Ex. 2 at 101 ("MG-1 is a good pineapple.  That's all [Dole]

produce[s] in Hawaii.  We produce it as a substantial percentage in Latin America."); see also

Goldfarb Decl. Ex. 2 at 175–181; Hr'g Tr. at 18.)[12]  "[F]ailure to discuss the import of, or even

mention, these material facts . . . amounts to cherry-picking the facts . . . , and such selective use

of facts fails to satisfy the scientific method and Daubert."  LeClercq v. The Lockformer Co.,

No. 00 Civ. 7164, 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005) (internal quotations and

citation omitted); see also Water Craft Mgmt., L.L.C. v. Mercury Marine, 361 F. Supp. 2d 518,

544 (M.D. La. 2004) ("The evidence presented in this case established that Mercury had other

competitors in the boat engine market, but Dr. Wood's focus was only on Mercury engines."); El

Aguila Food Prods., Inc. v. Gruma Corp., 301 F. Supp. 2d 612, 620–24 (S.D. Tex. 2003)

---

[12]     At the Daubert Hearing, Dr. Cotterill characterized the MG-1 and CO-2 as "hypothetical
test market pineapples" which "are not broadly distributed in a way that competes," (Hr'g Tr. at
33, 35), but he failed to provide sufficient facts or data to support this conclusion.  See Allstate
Ins. Co. v. Hamilton Beach/Proctor-Silex, Inc., No. 06 Civ. 1186, 2008 WL 3891259, at *5
(W.D. Pa. Aug. 19, 2008) ("[E]xpert testimony based on assumptions that lack any factual
support in the record properly are excluded."); Malletier v. Dooney & Bourke, Inc., 525 F. Supp.
2d 558, 643 (S.D.N.Y. 2007) ("The court does not fulfill its gatekeeper function if it simply
accepts the ipse dixit of an expert.").

(excluding expert testimony "based on wholly insufficient data" while failing to take into account "the facts of the case"); Torch Energy Mktg. Inc. v. Pac. Gas & Elec. Co., No. 01 Civ. 3402, 2003 WL 22703235, at *9 (S.D. Tex. Mar. 31, 2003) ("Korn's expert report also fails to take into account the facts disclosed in the summary judgment evidence.").

Utilizing the Merger Guidelines, (see Cotterill Report at 12); see also Merger Guidelines, 57 Fed. Reg. 41,552, § 1.11 (Sept. 10, 1992), Dr. Cotterill concluded that, because Del Monte was able "profitably" to raise price by more than 5% on MD-2 pineapples "from the competitive price level," the MD-2 variety constitutes the relevant product market. (See Hr'g Tr. at 31-33; Cotterill Report at 12 & App. A.)[13] But Dr. Cotterill applied the Merger Guidelines in an overly mechanical fashion. See Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc., 294 F. Supp. 2d 1291, 1310 (M.D. Fla. 2003); see also Vermiculite, 98 F. Supp. 2d at 737; Kraft, 926 F. Supp. at 359 ("As the introductory paragraphs to the Merger Guidelines point out, . . . 'mechanical application of [the Merger Guidelines] standards may provide misleading answers to the economic questions raised under the antitrust laws.'") (quoting Merger Guidelines, 57 Fed. Reg. 41,552, § O n.4). Even though (at least some) consumers purchased MG-1 and CO-2 pineapples during the Class Period, Dr. Cotterill selected a much more narrow "tentative" product market for testing under the Merger Guidelines, i.e., the MD-2 pineapple alone. (See

---

[13]    Under the Merger Guidelines, in determining a product market one considers "a hypothetical profit-maximizing firm selling all of the product in that market [that] could charge significantly more than a competitive price, i.e., without losing so many sales to other products that its price became unprofitable[.]" United States v. Visa U.S.A., Inc., 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001); see also Merger Guidelines, 57 Fed. Reg. 41,552, § 1.11 ("small but significant and non-transitory" price increase assumed to be five percent "in most contexts"). If the price increase is unprofitable "then the next best substitute for the first product (i.e., the product that would account for the greatest value of lost demand for the first product), should be added to the relevant product group." See State of N.Y. v. Kraft Gen. Foods, Inc., 926 F. Supp. 321, 360 (S.D.N.Y. 1995); see also Merger Guidelines, 57 Fed. Reg. 41,552, § 1.11.

16

Cotterill Report at 12); Jonathan B. Baker, Market Definition: An Analytical Overview, 74 ANTITRLJ 129, 145–46 (2007) ("In practice, market definition would likely begin with a larger aggregate – all colas, all soft drinks, or all beverages, for example . . . . [I]t would almost never be appropriate to begin by disaggregating more narrowly than the specific products that are purchased by the buyers alleged to have been harmed by the conduct under review."); see also Corey, 2008 WL 4452386, at *45 ("according to the Merger Guidelines, in defining the scope of the relevant market, one must consider possible substitute products and consumer responses to price increases").

And, although it is not mandatory in determining a relevant product market, an analysis of the cross-price elasticity of demand between the MD-2 pineapple and potential substitutes (which was not undertaken) may have provided Dr. Cotterill with more "information relevant to assessing whether a proposed market definition is or is not reasonable." Kraft, 926 F. Supp. at 333; see also Lantec, Inc. v. Novell, Inc., 306 F.3d 1003, 1025 (10th Cir. 2002) (expert "did not calculate the cross-elasticity of demand to determine which products were substitutes"); Kentucky Speedway, 2008 WL 113987, at *4 ("no studies were done to determine whether . . . a family might patronize a Bengals or Reds game or some other sports event, instead of a NEXTEL race, if that cost were to be raised by $20 (5%)"); McLaughlin, 2004 WL 1629603, at *7 (expert "did no statistical analysis of the cross-elasticity of price, demand or supply").

Even if the Court were to consider Dr. Cotterill's testimony, the Court concludes that Plaintiffs' have failed to raise a triable issue of fact regarding the boundaries of the product market for the reasons described below. See Gulfstream, 294 F. Supp. 2d at 1308 ("even if admissible, the evidence presented by [plaintiff's] experts do not provide a sufficient basis upon which a reasonable jury could find that the relevant product market" proposed by plaintiffs

existed).

### *Brown Shoe* Factors

Defendants argue, persuasively, that certain factors or "practical indicia" of a product

market set forth in Brown Shoe Co. v. United States, 370 U.S. 294 (1962), "demonstrate that the

MG-1 and CO-2 are part of the same market as the MD-2." (Defs. Mem. at 29.) Plaintiffs

counter, among other things, that the "Brown Shoe factors strongly support Dr. Cotterill's

opinion." (Pls. Opp'n at 29.)

"In analyzing the relevant market, courts consider a number of factors beyond the

reasonable interchangeability of [the] product and its claimed substitutes." Klickads, Inc. v. Real

Estate Bd. of New York, Inc., No. 04 Civ. 8042, 2007 WL 2254721, at *7 (S.D.N.Y. Aug. 6,

2007) (citing Geneva Pharm. Tech. Corp. v. Barr Labs., Inc., 386 F.3d 485, 496 (2d Cir. 2004)).

"These factors include 'such practical indicia as [i] industry or public recognition of the

submarket as a separate economic entity, [ii] the product's peculiar characteristics and uses, [iii]

unique production facilities, [iv] distinct customers, [v] distinct prices, [vi] sensitivity to price

change, and [vii] specialized vendors.'" Klickads, 2007 WL 2254721, at *7 (quoting Brown

Shoe, 370 U.S. at 325). "A single product will only qualify as a submarket when it is so unique

and dominant in the market that there is no practical substitute." Frito-Lay, Inc. v. Bachman Co.,

659 F. Supp. 1129, 1136–37 (S.D.N.Y. 1986).

Plaintiffs have failed to "raise[] a genuine issue of fact even under the more generous

Brown Shoe criteria." Emigra, 612 F. Supp. 2d at 360; (see Pls. Opp'n at 30 (citing Cotterill

Report at 6–10.)) First, Plaintiffs' evidence suggests at most that some consumers and industry

participants prefer the MD-2 pineapple over other pineapples – it does not show that the MD-2

should be recognized as a distinct submarket for antitrust purposes. (See Pls. Opp'n at 30 (citing

Cotterill Report at 6–9)); see also Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430,

437 (3rd Cir. 1997) ("Interchangeability implies that one product is roughly equivalent to another

for the use to which it is put; while there might be some degree of preference for the one over the

other, either would work effectively.") (internal quotations and citation omitted); McLaughlin,

2004 WL 1629603, at *7 ("reasonable interchangeability allows for some preference for one

product over another"). As noted above, Dole's MG-1 and Maui's CO-2 pineapples have been

sold in direct competition with Del Monte's MD-2 pineapple. See Nifty Foods Corp. v. Great

Atlantic & Pac. Tea Co., Inc., 614 F.2d 832, 840 n.11 (2d Cir. 1980) (rejecting separate markets

where "private label and brand name waffles compete directly at the retail level").

      Second, the MD-2, MG-1, and CO-2 pineapples all appear to have "precisely the same

use and hence surely vie in a common product market." Liggett & Myers, Inc. v. FTC, 567 F.2d

1273, 1274–1275 (4th Cir. 1977). Drawing all reasonable inference in Plaintiffs' favor, the

record does not support the conclusion that the MD-2 pineapple is so unique (e.g., as compared

to the MG-1 and CO-2 pineapples) as to support (constitute) a separate submarket. (See, e.g.,

Goldfarb Decl. Ex. 16 at 119 (MD-2 has "[a] golden interior color" and MG-1 "also . . . ha[s] a

golden interior"); Ex. 31 at 273 (MG-1 has "characteristics of shell color and taste similar to or

maybe better than MD-2"); Ex. 61 at 37 (MG-1 pineapples are a "[g]olden, low acid variety. . . . .

They're sweet."); Ex. 91 at 1 ("Dole MG-1 is close to parity with . . . Del Monte Gold [i.e., MD-

2]."); Ex. 65 at 133 (MD-2 and CO-2 both "produce[] a sweeter, more vitamin C rich fruit"); Ex.

66 at 126 ("MD-2 and CO-2 had deeper orange color, deeper yellow color to them."); Defs. 56.1

¶¶ 29, 32; Pls. 56.1 ¶¶ 29, 32.); see also Bogan v. Hodgkins, 166 F.3d 509, (2d Cir. 1999)

("While a submarket may function as the relevant market for antitrust purposes, more is required

than a showing that a product differs from others."); George R. Whitten, Jr., Inc. v. Paddock Pool

Builders, Inc., 508 F.2d 547, 553 (1st Cir. 1974) ("[M]ere physical differences between one

product and others will not alone isolate that product in a separate submarket."); Frito-Lay, 659

F. Supp. at 1137 ("corn chips are not sufficiently distinguishable from other slated snacks to

have distinct customers and uses.").

With respect to Brown Shoe factors three through six, i.e., unique production facilities,

distinct customers, distinct prices, and sensitivity to price change, Plaintiffs' evidence indicates,

at most, that the MD-2 pineapple is distinct from the Champaka pineapple and certain "African

pineapples." (See Pls. Opp'n at 30 (citing Cotterill Report at 8–10, 14).)[14] This evidence is

largely irrelevant in determining whether the MD-2 pineapple forms a distinct submarket. See

G.R.J.H., Inc. v. Oxford Health Plans, Inc., No. 07 Civ. 68, 2009 WL 1362985, at *3 (N.D.N.Y.

May 14, 2009) ("Irrelevant or unnecessary facts do not preclude summary judgment, even when

they are in dispute.") (citation omitted); (see also supra n.8.)[15]

Plaintiffs' narrowly-defined product market appears to fail for two additional reasons.

See In re Super Premium Ice Cream Dist. Antitrust Litig., 691 F. Supp. 1262, 1268 (N.D. Cal.

1988). In his Report and at the Daubert Hearing, Dr. Cotterill characterized the MD-2 pineapple

as the "automobile," the Champaka pineapple as the "horse and buggy," and the MG-1 and CO-2

pineapples as "somewhere in the middle." (Cotterill Report at 10; Hr'g Tr. at 18.) But "[c]ourts

have repeatedly rejected efforts to define markets by price variances or product quality

---

[14]     For example, Plaintiffs argue that certain "African pineapples cannot compete in the U.S.
because they have no 'shelf-life', thereby making the production facilities of Costa Rican and
Hawaiian growers unique." (Pls. Opp'n at 30 (citing Cotterill Report at 14).) Plaintiffs cite to
evidence that "Champaka is a niche product" because "airlines . . . prefer it high acid content[,]"
(Cotterill Report at 10 (citation omitted)); that "Golds are approximately twice as expensive as
Champaka[s]"; and that an individual produce buyer from Meijer's supermarket sold "over twice
as many [Golds] as Champakas at twice the price," (Cotterill Report at 9, 10 (citations omitted)).

[15]     Plaintiffs do not appear to put forth any evidence regarding the seventh Brown Shoe
factor, i.e., the existence of specialized vendors. (See Pls. Opp'n at 30.)

variances." In re Super Premium Ice Cream, 691 F. Supp. at 1268 ("gradations among various

qualities of ice cream are not sufficient to establish separate relevant markets for the purposes of

determining market power"); see also, e.g., Murrow Furniture v. Thomasville Furniture Indus.,

Inc., 889 F.2d 524, 528 (4th Cir. 1989) ("The Discounters have not met their burden of

establishing that "better branded" furniture is not interchangeable with other furniture lines.");

Liggett & Myers, 567 F.2d at 1275 ("dry, semi-moist and canned [dog foods], both economy and

premium are, in reality, all welcome in the same kennel."); Com. of Pa. v. Russell Stover

Candies, Inc., No. 93 Civ. 1972, 1993 WL 145264, at *11 (E.D. Pa. May 6, 1993) (rejecting

submarket for gift boxed chocolates or boxed chocolates "within the general confectionery

market"); U.S. v. Joseph Schlitz Brewing Co., 253 F. Supp. 129, 145 (N.D. Cal. 1966) (rejecting

separate markets for "premium and non-premium beer").

Second, as noted above at page 13, it appears that Plaintiffs' narrow product market is a

single brand market, i.e., Del Monte MD-2 pineapples, at least for the first four years of the Class

period. "Many cases have rejected a narrow definition of [a] product market, limited to one

commodity." Nobel Scientific Indus., Inc. v. Beckman Instruments, Inc., 670 F. Supp. 1313,

1323 (D. Md. 1986); see also Domed Stadium Hotel, Inc. v. Holiday Inns, Inc., 732 F.2d 480,

488 (5th Cir. 1984) ("absent exceptional market conditions, one brand in a market of competing

brands cannot constitute a relevant product market"). Dole's MG-1 and Maui's CO-2 pineapples

(as well as Champaka pineapples) were sold in competition with Del Monte's MD-2 pineapple,

see supra pp. 14–17, and Plaintiffs have failed to offer sufficient evidence of exceptional market

conditions to justify their single brand market. See, e.g., In re Payment Card Interchange Fee

and Merchant Discount Antitrust Litig., 562 F. Supp. 2d 392, 403 (E.D.N.Y. 2008) ("A plaintiff

may choose Pepsi over Coke because 'the manufacturer has spent time and energy differentiating

his or her creation from the panoply of products in the market, but at base, Pepsi is one of many sodas' and does not belong in its own market.") (quoting Global Discount Travel Servs., LLC v. Trans World Airlines, Inc., 960 F. Supp. 701, 705 (S.D.N.Y. 1997)); Disenos Artisticos E Industriales, S.A. v. Work, 714 F. Supp. 46, 49 (E.D.N.Y. 1989) ("retailers are free to purchase other brands of decorative giftware besides Lladro").

In sum, Plaintiffs' Sherman Act claims fail because MD-2 pineapples do not constitute appropriately a separate submarket, and Plaintiffs do not appear to argue that Defendants' had monopoly power in the broader pineapple market. See PepsiCo, 315 F.3d at 109. But even assuming, arguendo, that Plaintiffs' were able to establish the relevant product market consisting of the MD-2 pineapple only, Plaintiffs' Sherman Act claims would (still) fail for the reasons set forth below.[16]

### (2)    Noerr-Pennington Immunity

### Expert Testimony

Defendants argue that Mr. Gould's testimony regarding Del Monte's alleged "sham" litigation and patent misuse should be excluded because, among other reasons, Mr. Gould "improperly purports to opine on the law," makes "ultimate legal conclusions based on the facts," and "draws inferences regarding Del Monte's intent." (Defs. Mem. at 18, 19–20; Defs.

---

[16]    United States Magistrate Judge Michael H. Dolinger's thoughtful discovery order, dated January 4, 2007, denying Plaintiffs' motion to compel certain Del Monte documents pursuant to the crime-fraud exception to the attorney-client privilege provides interesting background for this analysis. See In re Fresh Del Monte Pineapple Antitrust Litig., No. 04-md-1628, 2007 WL 64189, at *18 (S.D.N.Y. Jan. 4, 2007); see also Order, dated Nov. 9, 2007 (Berman, J.) ("Plaintiffs' Objections [#130] to Magistrate Judge Dolinger's Discovery Order, dated January 4, 2007, are denied"). Judge Dolinger concluded that Plaintiffs' Sherman Act claims "amount to little more than speculation supported by snippets of unreliable testimony and [are] undermined by the contextual evidence reflecting the corporate behavior of Del Monte." Id. at *16. The Court is mindful that "the burden on a non-movant opposing summary judgment falls far below the standard of probable cause applicable" to the crime-fraud exception. Sackman v. Liggett Group, Inc., 173 F.R.D. 358, 364 (E.D.N.Y. 1997).

Reply at 8.)  Plaintiffs counter, among other things, that they do not (even) plan to offer at trial

those portions of Mr. Gould's report that support the withdrawn fraud on the PTO claim and that

Mr. Gould's testimony should not be "excluded merely for framing his opinions by reference to

patent law and offering 'conclusions.'" (Pls. Opp'n at 19 (emphasis in original).)

"The Noerr-Pennington doctrine generally immunizes from liability a party's

commencement of a prior court proceeding." T.F.T.F. Capital Corp. v. Marcus Dairy, Inc., 312

F.3d 90, 93 (2d Cir. 2002) (citation omitted); see also United Mine Workers of Am. v.

Pennington, 381 U.S. 657, 669–70 (1965); Eastern R. Presidents Conf. v. Noerr Motor Freight,

Inc., 365 U.S. 127, 134–36 (1961). "Courts have extended Noerr-Pennington to encompass

concerted efforts incident to litigation, such as prelitigation 'threat letters[.]'" Primetime 24

Joint Venture v. Nat. Broad., Co., Inc., 219 F.3d 92, 100 (2d Cir. 2000). "This principle does not

apply, however, to 'sham' litigation." Alternative Electrodes, LLC v. Empi, Inc., 597 F. Supp.

2d 322, 330 (E.D.N.Y. 2009). "To establish 'sham' . . . judicial proceedings, a plaintiff must

show that the litigation in question is:  (i) 'objectively baseless,' and (ii) 'an attempt to interfere

directly with the business relationships of a competitor through the use of the governmental

process – as opposed to the outcome of that process – as an anticompetitive weapon.'"

Primetime, 219 F.3d 92, 100 (2d Cir. 2000) (quoting Prof'l Real Estate Inv., Inc. v. Columbia

Pictures Indus., 508 U.S. 49, 60 (1993)); see also Frosty Bites, Inc. v. Dippin' Dots, Inc., No. 01

Civ. 1532, 2003 WL 21196247, at *7 (N.D. Tex. May 19, 2003) ("Only if the court finds that the

lawsuit is objectively baseless does the subjective intent of the litigant come into play.").

Mr. Gould's proposed testimony addresses primarily three topics:  (i) "patent practices

and procedures in the PTO" and "Del Monte's alleged fraud on the PTO," (Expert Report of

George M. Gould, Esq., dated Dec. 22, 2005 ("Gould Report") at 3–4, 6–15); (ii) "Del Monte's

[alleged] sham litigations," (id. at 5–6, 16–19); and (iii) Del Monte's alleged misuse of the CO-2

Patent in, among other things, the Threat Letters "by asserting that [the CO-2 Patent] covered

[Del Monte's] MD-2 [pineapple]," (id. at 5, 15–16).  Defendants' objections to Mr. Gould's

testimony as it relates to Del Monte's alleged fraud on the PTO appear to be moot because

Plaintiffs have withdrawn their fraud on the PTO claim.  (See Pls. Opp'n at 19.)

      Mr. Gould's testimony regarding Del Monte's alleged "sham" litigations and patent

misuse is rejected by the Court as inadmissible and unnecessary.  Mr. Gould's (remaining)

testimony does not appear to involve technical issues (relating to patents) for which his expertise

might assist the trier of fact.  (See Gould Report at 15–18); see also Wills v. Amerada Hess

Corp., 379 F.3d 32, 46 (2d Cir. 2004) ("It is well settled that expert testimony is unnecessary in

cases where jurors 'are as capable of comprehending the primary facts and of drawing correct

conclusions from them'" as are expert witnesses) (quoting Salem v. U.S. Lines Co., 370 U.S. at

35); VIM, Inc. v. Somerset Hotel Ass'n, 19 F. Supp. 2d 422, 428 n.4 (W.D. Pa. 1998) ("lack of

objective baselessness is not the sort of issue that lends itself to expert testimony under Fed. R.

Evid. 702 and 704").  Mr. Gould's testimony "impinges upon the Court's role, would be

inadmissible at trial, and is of no probative value on this motion [for summary judgment]."  Ideal

World Marketing, Inc. v. Duracell, Inc., 15 F. Supp. 2d 239, 244 n.2 (E.D.N.Y. 1998); see

Okland Oil Co. v. Conoco, Inc., 144 F.3d 1308, 1328 (10th Cir. 1998) ("an expert may not state

his or her opinion as to legal standards nor may he or she state legal conclusions drawn by

applying the law to the facts"); VIM, 19 F. Supp. 2d at 428 n.4; Motown Productions, Inc. v.

Cacomm, Inc., 668 F. Supp. 285, 288 (S.D.N.Y. 1987) ("In this Circuit . . . the expert testimony

of an attorney as to an ultimate issue of domestic law or as to the legal significance of facts is

inadmissible."), rev'd on other grounds, 849 F.2d 781 (2d Cir. 1988); (see also, e.g., Gould

Report at 16 (concluding "that Del Monte committed patent misuse and fraud on the marketplace" and that "Del Monte's assertion of a trade secret claim against Dole was a sham."); 17 ("Del Monte's assertion of the [CO-2 Patent] against Maui was a sham. . . .").) And, some of Mr. Gould's testimony appears to usurp the role of the jury, for example, in attributing subjective motivations to the parties. See Aventis, 383 F. Supp. 2d at 516; (see also Gould Report at 15 ("Del Monte intentionally perpetuated the confusion"); 17 ("there is evidence to suggest that Del Monte had an improper subjective intent").)

Even if the Court were to consider Mr. Gould's proposed testimony as "arguments by counsel, not opinions of an expert," Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc., 478 F. Supp. 2d 340, 361 n.28 (E.D.N.Y. 2007); see also VIM, 19 F. Supp. 2d at 428 n.4, Plaintiffs have failed to raise triable issues of fact as to whether the Dole and Maui Actions constitute "sham" litigations as described below.

**Alleged "Sham" Litigations**

Defendants argue that "[t]here is no evidence that Del Monte learned that Dole's pineapples were the progeny of stolen seedlings earlier than three years before it sued Dole"; "Del Monte's trade secret claim was legitimate, even if Dole theoretically could have acquired [MD-2] plant material lawfully by purchasing the pineapple over the counter before its formal launch"; and under the settlement agreement with Dole, "Del Monte prevailed in substantial part on . . . its [Lanham Act] reverse palming off claim." (Defs. Mem. at 14, 15 (citation omitted); see also Defs. Reply at 8.) Defendants also argue that "the record shows that there is no basis for inferring that Del Monte knew, when it sued Maui for infringement, that [the CO-2 Patent] was unenforceable"; "Maui's actions in seeking a license under the CO-2 [P]atent provided Del Monte with ample reason to believe that patent was valid"; and "under [P]laintiffs' present

25

definition of the relevant product market . . . the Maui [Action] involving only the CO-2 pineapple is wholly irrelevant." (Defs. Mem. at 15, 16, 17.)

Plaintiffs counter, with respect to the Dole Action, that Del Monte knew at the time it filed its trade secret misappropriation claim that "it was time-barred"; "[i]t is undisputed that Del Monte placed MD-2 pineapples in the public domain by selling them in the United States with the crowns ["a compact tuft of stiff, short leaves" that is "commonly utilized for vegetative multiplication of the pineapple," Morton, J., <u>Fruits of Warm Climates</u> (Florida Flair Books 1987), 18–28] in the 1980's"; "Del Monte had no basis to assert a reverse 'palming off' claim for a product that it did not create or even have sole ownership of"; and despite "making an initial settlement demand of $160 million, Del Monte was content to settle its case against Dole for approximately $1.5 million." (Pls. Opp'n at 14, 15, 16, 17.) Plaintiffs also argue that "Del Monte previously admitted on multiple occasions that Maui had an ownership interest in the CO-2 pineapple" and "Del Monte was on explicit notice that the CO-2 [P]atent was invalid and unenforceable" as early as 1996. (<u>Id.</u> at 11.)

Plaintiffs have failed to put forth sufficient evidence upon which a jury could reasonably conclude that Del Monte's claims in the Dole Action were objectively baseless. <u>See</u> <u>In re Pineapple</u>, 2007 WL 64189, at *18 ("At the very least the record does not demonstrate that [Del Monte] had no chance of success [in the Dole Action], much less that Del Monte knew that fact and nonetheless pursued the claim."); <u>see also</u> <u>Cheminor Drugs, Ltd. v. Ethyl Corp.</u>, 993 F. Supp. 271, 281 (D.N.J. 1998). The district court in the Dole Action rejected arguments put forth by Dole in support of its motion to dismiss which are substantially similar to those raised by Plaintiffs in the instant case, <u>see</u> <u>Del Monte Fresh Produce Co. v. Dole Food Co., Inc.</u>, 136 F. Supp. 2d 1271, 1289-93 (S.D. Fla. 2001); <u>see also</u> <u>In re Pineapple</u>, 2007 WL 64189, at *19;

26

Arnett Physician Group, P.C. v. Greater LaFayette Health Servs., Inc., 382 F. Supp. 2d 1092, 1097 (N.D. Ind. 2005), concluding, for example, that it was "unclear from the face of Del Monte's complaint that it filed suit against Dole more than three years after it discovered the alleged misappropriations." Del Monte Fresh Produce, 136 F. Supp. 2d at 1293; see also Florida Stat. Ann. § 688.007. There is no evidence presented in the instant case to support a different conclusion. See In re Pineapple, 2007 WL 64189, at *18 ("the record before us does not demonstrate that Del Monte's contention as to timing was groundless"). The district court in the Dole Action also found that "at least one Federal Circuit has squarely recognized that plant material can constitute a trade secret, even if it is readily available to the public." Del Monte Fresh Produce, 136 F. Supp. 2d at 1292 (citing Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc., 35 F.3d 1226 (8th Cir.1994)); see also In re Pineapple, 2007 WL 64189, at *18 ("Since Del Monte contended that its efforts to commercially develop the MD-2 pineapple in the mid-1990s had required it to obtain knowledge and experience not available to the public, it had a potentially viable trade-secret claim . . . ."). And, the district court in the Dole Action found Del Monte's reverse palming off claim "cognizable under the Lanham Act." Del Monte Fresh Produce, 136 F. Supp. 2d at 1286–89. "[T]he availability of the MD-2 variety to the public does not undermine Del Monte's Lanham Act claim." Id. (citing Pioneer Hi-Bred, 35 F.3d 1226).[17] And, the fact that Del Monte settled the Dole Action for $1.5 million does not undermine the merit of Del Monte's claims. See In re Pineapple, 2007 WL 64189, at *19 ("Whatever may have been the value of [the] concessions by Dole, we cannot say that they are consistent with [P]laintiffs' contention here that Del Monte's lawsuit, or any of its claims, was a sham.") (citing

---

[17]     The district court ultimately dismissed without prejudice Del Monte's Lanham Act claim because Del Monte "failed sufficiently to allege the third and fourth elements – that Dole's actions are likely to cause consumer confusion and that Del Monte was injured." Del Monte Fresh Produce, 136 F. Supp. 2d at 1290.

Movers & Warehousemen's Ass'n of Greater N.Y. v. Long Island Moving & Storage Ass'n, No. 98 Civ. 5373, 1999 WL 1243054, at *6 (E.D.N.Y. Dec. 16, 1999) ("resolution [by settlement] does not lend itself well to the label objectively baseless"); see also Theme Promotions, Inc. v. News Am. Mktg FSI, 546 F.3d 991, 1008 (9th Cir. 2008) ("The fact that this ongoing litigation settled suggests that the original suit was not objectively baseless.").

Plaintiffs have failed also to put forth sufficient evidence upon which a jury could reasonably conclude that Del Monte's patent infringement counterclaim in the Maui Action was objectively baseless. See In re Pineapple, 2007 WL 64189, at *19; see also Boston Scientific Corp. v. Schneider (Europe) AG, 983 F. Supp. 245, 272 (D. Mass. 1997). For one thing, the record does not support the conclusion that Del Monte knew the CO-2 Patent was "obviously invalid" at the time it asserted the patent infringement counterclaim. Buztronics, Inc. v. Theory3, Inc., No. 04 Civ. 1485, 2005 WL 1865512, at *4 (S.D. Ind. Aug. 5, 2005); see In re Pineapple, 2007 WL 64189, at *19 ("In short, we see no basis for inferring that Del Monte knew, when it sued Maui for infringement, that its patent was unenforceable."). Only days before Del Monte filed the Maui Action, Maui filed a separate lawsuit against Del Monte in the Circuit Court of the State of Hawaii, Second Circuit, seeking, among other things, a declaratory judgment that Maui has "the use of the [CO-2] [P]atent in perpetuity through an exclusive license" from Del Monte. (Goldfarb Decl. Ex. 133 at 12, 16); see also In re Pineapple, 2007 WL 64189, at *19 ("Maui's efforts to obtain a license – which culminated in its 2001 lawsuit to compel the issuance of a license – are inexplicable if it was aware that the patent was unenforceable."). Defendants' argue persuasively that the Maui Action, which involved only the CO-2 pineapple, "cannot possibly constitute sham litigation intended to impede competition in a market that excludes the CO-2 [pineapple]." (Defs. Mem. at 17); see also Schor v. Abbott Labs.,

28

378 F. Supp. 2d 850, 856 (N.D. Ill. 2005) ("To state a claim for a Sherman Act violation, a plaintiff must allege conduct that hurts competition in the relevant market.").[18]

In a footnote in their opening brief, Defendants argue that the Threat Letters are subject to Noerr-Pennington immunity, (see Defs. Mem. at 7 n.8 (citing Primetime, 219 F.3d at 100)); see also Theme Promotions, 546 F.3d at 1007; A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc., 263 F.3d 239, 253–54 (3rd Cir. 2001) (citing cases), and neither party appears to offer extensive argument on this issue. See also Rowley v. City of New York, No. 00 Civ. 1793, 2005 WL 2429514, at *6 (S.D.N.Y. Sept. 30, 2005) ("As to an argument raised in a footnote . . . this also may not be properly considered."). Assuming, arguendo, that the Threat Letters are not subject to Noerr Pennington immunity, Plaintiffs' Sherman Act claims fail because, among other reasons, there is insufficient evidence to create a triable issue of fact that Defendants willfully acquired or maintained monopoly power in the extra sweet pineapple market. See Trans Sport, 964 F.2d at 188; Liveuniverse, Inc. v. Myspace, Inc., No. CV 06-6994, 2007 WL 6865852, at *16 (C.D. Cal. June 5, 2007); (see also Hr'g Tr. at 51–52.)

### (3)    Anticompetitive Effects

### Expert Testimony

Defendants argue that Dr. Cotterill's testimony regarding the alleged anticompetitive effects of Del Monte's conduct is unreliable because, among other reasons, it "is not based on any economic analysis"; "it is nothing more than his personal interpretation of a one-sided review of the facts"; and it "fails to consider numerous lawful explanations for Dole's delayed entry." (Defs. Mem. at 37; Defs. Reply at 16–17.) Plaintiffs counter that "economists routinely

---

[18]    Because Del Monte's claims in the Dole and Maui Actions were not objectively baseless, the Court's "analysis stops after the first prong of the [sham litigation] test." Baltimore Scrap Corp. v. David J. Joseph Co., 237 F.3d 394, 399 (4th Cir. 2001).

evaluate evidence with regard to business incentives and economic decisionmaking" and "[b]y specifying record evidence that supports his opinions, Dr. Cotterill appropriately shows that his opinion fits the facts, which is one of the criteria of admissibility under Daubert." (Pls. Opp'n at 36 n.47, 37–38 (internal quotations and citation omitted).

To sustain a claim under Section 2 of the Sherman Act, Plaintiffs must prove that Defendants "willfully acquired or maintained [their monopoly] power, thereby causing unreasonable 'exclusionary,' or 'anticompetitive' effects." Trans Sport, 964 F.2d at 188; see also Microsoft, 253 F.3d at 58 ("[T]o be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect.'"). "The test is not total foreclosure [of competition], but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." Dentsply, 399 F.3d at 191; see also Interface Group, Inc. v. Mass. Port Auth., 816 F.2d 9, 10 (1st Cir. 1987) ("anticompetitive," in the context of the Sherman Act, "refers not to actions that merely injure individual competitors, but rather to actions that harm the competitive process").

Dr. Cotterill's proposed testimony is rejected by the Court to the extent that it "does not demonstrate any particular scientific expertise that can be assessed for reliability or that would ultimately assist the finder of fact." Kennedy v. Joy Tech., Inc., 269 Fed. App'x. 302, 312 (4th Cir. 2008); (see Cotterill Report at 17–48.) That is, in his Report, Dr. Cotterill appears to recite selective facts in the record and then offers his own legal conclusions that Del Monte's competitors were delayed in entering the extra-sweet pineapple market. See Torch, 2003 WL 22703235, at *10; Highland Capital Mgmt., L.P. v. Schneider, 379 F. Supp. 2d 461, 468–73 (S.D.N.Y. 2005); see also Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073, 1080 n.4 (10th Cir. 2006) ("generally, an economist's role in an antitrust case is not to prove facts, but to

30

opine on economic theory"). Although Dr. Cotterill testified at his deposition that he performed

"a reasoned economic analysis, based upon a review of the facts in this case," (Cotterill Dep. at

128); see also U.S. Info. Sys., Inc. v. Int'l Broth. of Elec. Workers Local Union, 313 F. Supp. 2d

213, 229 (S.D.N.Y. 2004), he failed sufficiently to explain what this "reasoned economic

analysis" entailed and how it was applied to the facts cited in his Report. See Mid-State

Fertilizer Co. v. Exchange Nat. Bank of Chicago, 877 F.2d 1333, 1340 (7th Cir. 1989) (expert

who "examined materials produced in discovery and drew inferences from the record, speaking

in legal rather than economic terms"); Hynix Semiconductor Inc. v. Rambus Inc., No. 00 Civ.

20905, 2008 WL 73689, at *5 (N.D. Cal. Jan. 5, 2008) (expert economist failed to "explain the

'reliable methods' he applied to decide that [plaintiff's] conduct caused its increase in market

power" and his discussion of reasonable royalty rates "does not convert a paragraph of advocacy

into 'economic analysis.'"); see also Gregory J. Werden, Economic Evidence on the Existence of

Collusion: Reconciling Antitrust Law With Oligopoly Power, 71 ANTITRLJ 719, 792 (2004)

("Expert economists often draw inferences that may be reasonable but that do not involve the

practice of economics.").

        The legal conclusions reached by Dr. Cotterill include the following: "I conclude that

Del Monte's patent-related exclusionary actions derailed Dole's commercialization of Gold

pineapples starting in March 1995 and continuing to January 1998," (Cotterill Report at 35), and

"Del Monte['s] use of a fraudulent patent and related exclusionary letters delayed [Chiquita

Brands Int'l, Inc.'s ("Chiquita")] and Banacol's entry into the Gold [pineapple] market,"

(Cotterill Report at 40.) Legal conclusions such as these respectfully lie outside Dr. Cotterill's

expertise and would appear to usurp the role of the jury. See Hygh v. Jacobs, 961 F.2d 359, 363

(2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert

testimony that expresses a legal conclusion."); <u>U.S. Info. Sys.</u>, 313 F. Supp. 2d at 240 ("Dr. Dunbar would not be permitted to state that the defendants did or did not engage in anticompetitive conduct."); <u>see also</u> <u>Aventis</u>, 383 F. Supp. 2d at 515–17.

Even if the Court were to consider Dr. Cotterill's testimony, Plaintiffs have failed to put forth sufficient evidence upon which a jury could reasonably conclude that Del Monte's conduct delayed competitors' entry into the extra sweet pineapple market as explained below.

### Alleged Delays in Competitive Entry

Defendants argue, among other things, that "the undisputed evidence shows that Del Monte's conduct did not significantly preclude other companies," including, among others, Dole, Maui, Chiquita, along with independent pineapple growers, "from competing to produce extra-sweet pineapples for sale." (Defs. Mem. 31; <u>see also</u> <u>id.</u> at 31–36; Defs. Reply at 13–16.)[19] Defendants also argue that the production of MD-2 plant material by independent growers in Costa Rica "increased steadily from at least 1994 onward." (<u>Id.</u> at 34.) Plaintiffs counter, among other things, that "[t]here is more than adequate evidence to establish questions of material fact with regard to whether Del Monte's conduct slowed its competitors' market entry and deterred competition." (Pls. Opp'n at 31; <u>see also</u> <u>id.</u> at 31–35.)

The record as a whole does not provide sufficient support for the conclusion that the 1995 Threat Letters deterred and/or delayed competition in the market for extra sweet pineapples. <u>See</u> <u>In re Pineapple</u>, 2007 WL 64189, at *9 ("There is . . . no meaningful evidence that any potential competitor of Del Monte slowed or stopped any plans to enter the market as a result of the[]

---

[19]     The parties identify Dole, Maui, Chiquita, and certain independent growers in Costa Rica as the primary sources of competition for the production and sale of MD-2 pineapples. (<u>See</u> Defs. Mem. at 31–35; Pls. Opp'n at 31–34; <u>see also</u> Cotterill Report at 18 (Dole, Chiquita and Maui were "the most likely potential entrants to challenge Del Monte"), 19 (independent growers in Costa Rica were "[a]nother set of players in the entry game")).)

[Threat] [L]etters."); see also Trans Sport, 964 F.2d at 189 ("Trans Sport has alleged no facts from which a trier of fact could infer that Starter's subsequent decision to prevent authorized retailers from selling to other dealers was purposefully designed to fix prices or to exclude competition.") (internal quotations and citation omitted); Rural Tel. Serv. Co., Inc. v. Feist Publ'ns, Inc., 957 F.2d 765, 767 (10th Cir. 1992) ("Feist Publications offered no proof competition in the yellow pages advertising market was reduced as a result of Rural Telephone's actions."); U.S. v. Empire Gas Corp., 537 F.2d 296, 305 (8th Cir. 1976) ("There is insufficient proof that the competitors of Empire . . . decided not to enter the LP business or decided to leave the business on account of defendant's actions."); Century Air Freight, Inc. v. Am. Airlines, Inc., 597 F. Supp. 564, 574 (S.D.N.Y. 1984) ("American's conduct did not demonstrably reduce competition in the relevant market.").

David A. DeLorenzo, Dole's President until 2001, stated: "I would hesitate to say how much it delayed [Dole], if it delayed us at all." (Goldfarb Decl. Ex. 20 at 181; see also id. at 182 ("Whether it actually delayed [Dole] going forward is just difficult for me to say. As I said, we were weighing so many other factors at the time. . . . I would be reluctant to say that it delayed us or that it sped us up.").) In the 1990s, Dole took a slow and cautious approach toward developing its own MD-2 pineapple (i.e., the MG-3), because of the (earlier) failure of its Dominican Republic pineapple operations. (See Goldfarb Decl. Ex. 18 at 95 (Dole "admittedly go[es] very, very slowly with pineapple development" and "the Dominican Republic production issues . . . made us – made [Mr. DeLorenzo] especially even more cautious about doing anything with the – any newer varieties or new products[.]"); id. Ex. 19 at 188–89 ("The experience in the Dominican Republic did make us probably more cautious in the early '90s than we might otherwise have been in the past, specifically with regard to fresh pineapple.").) The record also

33

indicates that Dole was researching the MD-2 until at least 1996, about the time it first decided to

begin propagating MD-2 pineapples for commercialization. (See id. Ex. 60 at 65 ("Dole

propagated MD-2 plants . . . for experimental, observation, or noncommercial purposes" from

about "1994 through 1996 when Dole began to propagate for commercial purposes.").)[20]  When

Dole made its decision to enter the market in or about 1996, Dr. Jorge Gonzalez, Dole's top

pineapple scientist, readily determined that the CO-2 patent did not cover the MD-2 pineapple.

(See id. Ex. 26 at 201, 288–89; Goldfarb Reply Decl. Ex. 6 at 42, 44–45, 61); see also In re

Pineapple, 2007 WL 64189, at *16 (that the Threat Letters would have led competitors to

abandon plans to compete with Del Monte "is particularly difficult to credit since the competitors

were free to examine the patent and to compare the plants to ensure themselves as to the scope of

coverage.  And indeed it appears that this was done, at least by Dr. Jorge Gonzalez, Dole's top

pineapple scientist."); (Hr'g Tr. at 52–53.)  According to Dr. Johannes W. Klink, a Dole

scientist, Dole's overall MD-2 pineapple production increased once it began the conversion

---

[20]     Dole was "aware of what Del Monte was doing in the market, we were aware at some
point that they had really stepped up their efforts to make the conversion [to the MD-2].  I made
the decision not to step up at that particular point in time to really push it so that we would have
some more time to study it. . . .  [I]t had really been . . . a long kind of pondered look at things.  If
anything, we looked at things for too long."  (Goldfarb Decl. Ex. 19 at 32–33; see also id. at 45–
47 ("At one point in time [in 1994], in a casual conversation I did say to the then president of Del
Monte that I thought that he had to be very careful with pineapples and that you run the risk of
moving too quickly if you don't study the agronomic issues for quite some time."), 88 ("So I
would say up until maybe '96 or '97, we were looking at all different alternatives and we really
didn't know the potential of what the different products would be.").)  And, the record indicates
that other Dole executives "thought that the sweeter [i.e., MD-2] variety" would "never make it
in the U.S.," until at least 1996 when Dole witnessed the successful introduction of Del Monte's
MD-2 pineapple.  (Goldfarb Decl. Ex. 26 at 170 ("Q:  And when you saw that Del Monte was
selling it in large quantities and that it was doing well, is that what prompted Dole to become
interested in selling a yellow [e.g., MD-2] variety?  A:  That's correct."); see also id. Ex. 16 at 61
("[I]n 1997, I didn't believe that [the MD-2] would be more than a niche product."); id. Ex. 20 at
56 ("Q:  When did you first believe that the MD-2 was an important variety of pineapple?  A:
1997 maybe."); Decl. of Carl E. Goldfarb, dated Dec. 8, 2008 ("Goldfarb Reply Decl."), Ex. 6 at
44.)

process in or about 1996. (Goldfarb Decl. Ex. 31 at 236–37 ("Q: That [is] what Dole has always done is steadily increase its [MD-2] standings? A: Since it – since it started it, yes.").

Douglas R. Schenk, Maui's President until about 2003, testified that since 1993, Maui's propagation of CO-2 and MD-2 pineapples was generally limited by "agricultural practices that were less than optimum for plant propagation[.]" (Goldfarb Decl. Ex. 54 at 214–15.) He did not know of any time when Maui was unable "to sell off the [73-114/MD-2] and [73-50/CO-2] that [Maui] grew and had available for sale[.]" (Id. at 214.) And, Maui's view during Mr. Schenk's tenure as President was that "it had the absolute right to do anything it wanted" with the MD-2 and CO-2 pineapples, (id. Ex. 58 at 245–46). (See also id. Ex. 58 at 223–27, 255 ("Q: Do you believe [there] was any restriction on selling 73-114 [MD-2], in September of 2000, if the seed was acquired legitimately? A: I don't believe there was any restriction."), 282 ("Q: And I think you have testified that you are not aware of a single grower that refused to sell MD-2 or 73-114 seed to Maui, is that right? A: I'm not aware of any."), 284.) The record also indicates, among other things, that Maui engaged in a "measured and considered" development of its fresh pineapple operations, (Goldfarb Decl. Ex. 58 at 158), and that, as late as 2003, Maui was still "debating how much of a fresh whole pineapple company it should be, and how much of a canned pineapple company it should be," (id. at 159).

James R. Wiley, a Chiquita executive, testified that in 1998, Chiquita "didn't know anything about the [MD-2] pineapple" and did not decide to enter the market until "the latter part of 2002," approximately seven years after Del Monte sent the Threat Letters. (Goldfarb Decl. Ex. 62 at 132–33.) Chiquita had its own difficulties growing pineapples in the Dominican Republic and chose not to "start its own pineapple growing operation[s]" in favor of purchasing MD-2 pineapples from other sources in Latin America, including a potential business venture

35

with Maui. (Id. at 128–29; see id. at 62; Ex. 63 at 286 ("Q: Would it be fair to say then that what Chiquita was doing when it was contemplating entering the market and when it did actually enter the market was to basically compete with other purchasers of Gold pineapple for the existing supply? A: That's correct."); Ex. 94; Ex. 114.) Chiquita was able to obtain MD-2 pineapples from Maui's Costa Rican affiliate, Royal Coast, as well as from other sources. (See id. Ex. 58 at 268; Ex. 62 at 208 ("Q: Sir, does this refresh your recollection that after the termination of the negotiations by Maui, Maui and Chiquita continued doing business by Maui selling to Chiquita [the] 73-114 [MD-2] variety? A: Okay. Yes."); Ex. 63 at 269 ("Q: Sir, you testified . . . earlier that at least as of this – in your earlier deposition that at least [as] of this date of April 24th, 2001 you knew that the MD-2 was not patented; is that correct? A: Yeah, that's correct."), 275–81, 295–96; Ex. 114.)

And, the record does not support the conclusion that the Threat Letters affected MD-2 pineapple production by independent growers in Costa Rica, who were the entities to which the so-called Threat Letters were directed. (See Goldfarb Decl. Ex. 79; Ex. 83.) To the contrary, Dole's Dr. Klink testified that he visited certain independent growers in Costa Rica at various times between 1994 and 2004 and observed that they "kept planting and growing more and more MD-2[.]" (Goldfarb Decl. Ex. 31 at 225–26; see also id. at 233 ("Q: You visited a lot of these farms. Did you ever see them – did you see a single independent grower saying, 'I'm not growing the MD-2 anymore'? A: I have not seen that, no. Q: In fact, you saw the opposite. You saw the independent growers increasing and increasing their MD-2 plantations from '94 on to the 2000s; correct? A: That's correct.")); see also Mfg. Research Corp. v. Greenlee Tool Co., 693 F.2d 1037, 1043 (11th Cir. 1982) ("The number of competitors in the cable bender market has increased, the number of available products has increased, and the price of available products

36

has decreased. No anticompetitive effect on the market can be shown."). Similarly, Maui's Mr. Schenck testified that he was "not aware of any" independent growers in Costa Rica who refused to sell MD-2 seed to Maui. (Goldfarb Decl. Ex. 58 at 282.) By late 2001, Dole, Royal Coast (Maui's Costa Rican affiliate) and other companies were involved in a "bidding war" to obtain MD-2 pineapples from independent growers in Costa Rica, who were "offering their pineapple out to the highest bidder." (Id. at 288–89.) And, as noted above, by 2002 Chiquita was able to obtain MD-2 pineapples from independent growers in Costa Rica, including Royal Coast. (See supra p. 36; see also Goldfarb Decl. Ex. 63 at 309–11.)

Even assuming, arguendo, that Plaintiffs were able to establish that Del Monte's conduct had anticompetitive effects, Defendants have proffered a legitimate business justification for the Threat Letters which precludes Section 2 liability. See Trans Sport, 964 F.2d at 189.

### (4)    Legitimate Business Justification

Defendants argue, among other things, that the Threat Letters were sent for a legitimate business justification, i.e., "to deter the theft of Del Monte's MD-2 plant material," not "to improperly exclude [competitors] from the market." (Defs. Mem. at 6, 7.) Defendants also argue that "by dropping [their] PTO fraud claim, [P]laintiffs have rung the death knell for [their] lawsuit" because Del Monte's competitors "had access to the accurate, public description in the [CO-2] [P]atent." (Id. at 2; see also Hr'g Tr. at 52 ("That is the dismissal of the keystone, the cornerstone of [Plaintiffs'] entire case.").) Plaintiffs counter, among other things, that the Threat Letters were used "to deceive competitors into believing mistakenly that the MD-2 pineapple was patented," and that "conduct having both an anticompetitive purpose and another purpose is still anticompetitive." (Pls. Opp'n at 6, 9.)

Even if a company exerts monopoly power, it may defend its practices by establishing a

business justification. See Dentsply, 399 F.3d at 191; see also Microsoft, 253 F.3d at 59 ("[I]f a

plaintiff successfully establishes a prima facie case under § 2 by demonstrating anticompetitive

effect, then the monopolist may proffer a 'procompetitive justification' for its conduct.").

Legitimate business justifications for alleged anticompetitive behavior "prevent a rational trier of

fact from finding § 2 liability." Trans Sport, 964 F.2d at 189; see also Lerma v. Univision

Commc'ns, Inc., 52 F. Supp. 2d 1011, 1019 (E.D. Wis. 1999) ("conduct will not be condemned

when it is determined that it constituted no more than aggressive competition or the rigorous

pursuit of legitimate business objectives") (internal quotations and citation omitted).

        Defendants appear to have had a legitimate business justification, i.e., "protecting against

the propagation of stolen [Del Monte MD-2] plant material[.]" (Defs. Mem. at 8); see Trans

Sport, 964 F.2d at 190 ("Starter's conduct is further justified by its legitimate interest in

combating counterfeiting."); Landmark Dev. Corp. v. Chambers Corp., 752 F.2d 369, 372 (9th

Cir. 1985) ("Landmark's fraud in purchasing products purportedly for its own use in Alaska and

reselling them to dealers in Schreiber's exclusive territory was a legitimate business reason for

Chambers' refusal to sell more of its product to Landmark."); Advanced Computer Servs. of

Mich., Inc. v. MAI Sys. Corp., 845 F. Supp. 356, 370 n.17 (E.D. Va. 1994) ("Here, there is no

question that MAI had a valid reason for taking its actions – the protection of its copyrighted

material."); see also In re Pineapple, 2007 WL 64189, at *14 ("Del Monte was entitled to

demand that those entities [to whom the Threat Letters were sent] refrain from using purloined

seedlings."). Defendants' business justification is supported by evidence in the record. (See,

e.g., Goldfarb Decl. Ex. 23 at 211–12 ("[T]he fact that [Del Monte's MD-2 pineapples] were

being stolen and presumably planted, they might reach a major competitor like Dole and it was

very important to us to try to stop them from leaving the plantation, stop people from growing

them, propagating them. Hence my letter to Mr. Arias."); Ex. 24 at 125–28; Ex. 25 at 110–15,

133; Ex. 26 at 103–05; Ex. 28 at 132, 165 ("What I do know was that in 1995, quite a lot of

[MD-2 plant] material was stolen from [Del Monte], and we were hearing, and that some people

had an interest in propagating materials in the laboratories. That's why these letters were sent

out."); Ex. 29 at 138–39, 157–60, 165; Ex. 41 at 329 ("Well, my understanding of the purpose of

the letter, after I read it, would be to stop what I would consider personally illegal activity . . . .");

Ex. 80; Ex. 90 at 10; Ex. 142 ¶¶ 10, 12.)

      And, Plaintiffs have failed to put forth sufficient evidence to raise a genuine issue of fact

that the Threat Letters were a pretext "to deceive competitors into believing mistakenly that the

MD-2 pineapple was patented." (Pls. Opp'n at 6); see Microsoft, 253 F.3d at 59; Ill. ex rel.

Hartigan v. Panhandle E. Pipe Line Co., 730 F. Supp. 826, 933 (C.D. Ill. 1990) ("Antitrust

liability lies only if business reasons are merely a pretext for anticompetitive behavior."); see

also In re Pineapple, 2007 WL 64189, at *14 ("Plaintiffs' attack on the reality of the stolen-

pineapple allegation is makeweight" and "the evidence suggests only that [Del Monte] was

seeking to deter the laboratories suspected of obtaining stolen seedlings from using those

seedlings"). The record includes senior executive level communications between Del Monte and

its major competitors throughout the Class Period "that made clear that the [CO-2 Patent]

covered only the CO-2 variant and that it did not cover the MD-2 plant." In re Pineapple, 2007

WL 64189, at *14; see also City of Chanute v. Williams Natural Gas Co., 743 F. Supp. 1437,

1460 (D. Kan. 1990) ("the Cities have not offered sufficient evidence to refute Williams'

legitimate business objectives" and "the Cities' [pretext] arguments are simply implausible given

what the record as a whole . . . reveals"). For example, on March 22, 2004, when the CO-2

patent was approved by the PTO and approximately a year before the Threat Letters were sent,

Del Monte sent Maui's Mr. Schenk a memorandum stating: "For your information the plant patent application for pineapple . . . 73-50 (named CO-2) has been approved by the [PTO]." (Goldfarb Decl. Ex. 75.) In September 1995, approximately six months after the Threat Letters were sent, Del Monte met with Dole regarding a potential acquisition of Del Monte and informed Dole (not that the MD-2 was patented) but that Del Monte "had a very significant amount [of MD-2] already converted, that it would take [Dole] a bit of time to catch up with them" and that "if [Dole] purchased [Del Monte], in fact, [Dole] could save a number – a lot of capital expenditure by not having to invest as much into the product[.]" (Id. Ex. 18 at 238; Ex. 19 at 56–57; see also id. Ex. 19 at 69-70 ("Q: During any, during this meeting or the '94 meeting or any meeting you had with Mr. Sanchez or Mr. Bours [of Del Monte], did they ever tell you that the MD-2 was patented and that Dole couldn't grow it, period? A: I don't recall ever hearing from either of those two gentleman that there was any patent[], no.").) In 1995, Del Monte also provided potential acquirers of Del Monte, including Dole and Chiquita, with an offering memorandum that touted its new "Fresh Del Monte pineapple," i.e., the MD-2, but made no reference to any patent protection. (Id. Ex. 19; see also id. Ex. 62 at 136 ("Q: Now, you're not aware, sir, in any of that due diligence Del Monte made any representation to Chiquita or any other potential purchaser that the MD-2 was patented; is that right, sir? A: That's correct.").) And, in April 2000, Del Monte informed Maui "that MD-2 cannot be patented" and that Maui "can do what you want with MD-2 and Del Monte will not sue Maui [] if you sell this variety." (Id. Ex. 99; see also id. Ex. 58 at 209 ("Q: This would be one more time that [Del Monte] advised Maui that the MD-2 was not patented, would you agree? A: You could infer that from reading this."); Ex. 100.)

In sum, these communications, among others, support the argument that Del Monte was

40

"sending a message to the highest levels of its competitors and to the financial community that it had a competitive edge because it had been first in the market for the extra-sweet pineapple, an emphasis that plainly belied the implication that it had legal protection against direct competition." In re Pineapple, 2007 WL 64189, at *15; (see also Hr'g Tr. at 55–59).

    **(4)    Damages**

In view of the Court's finding on the issue of antitrust liability, the Court need not reach the question of damages. See George R. Whitten, 376 F. Supp. at 136; see also Heary Bros. Lightning Prot. Co., Inc. v. Lightning Prot. Inst., 262 F. App'x 815, 817 (9th Cir. 2008) ("Because this conclusion disposes of the Sherman Act claim, we do not need to reach the issue of damages . . . .").

**<u>Indirect Purchasers</u>**

Defendants argue, persuasively, that the five remaining Indirect Purchasers' Sherman Act claims fail for the same reasons that the Direct Purchasers' Sherman Act claims fail. (See Defs. Mem. at 44.) Plaintiffs do not appear separately to respond to Defendants' arguments regarding the Indirect Purchasers.

As a preliminary matter, the remaining Indirect Purchasers' Sherman Act claims are deemed abandoned to the extent that the opposition papers (filed on behalf of both the Direct and Indirect Purchasers) fail to counter Defendants' arguments. See Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."). In any event, the Direct Purchasers' and Indirect Purchasers' Sherman Act claims appear to be identical and thus fail for the same reasons as set

forth above.[21]

The Indirect Purchasers' state law claims are dismissed without prejudice. See Schor v. Abbott Labs., 378 F. Supp. 2d 850, 860 (N.D. Ill. 2005).[22] For one thing, the Complaint alleges only the residence, not the citizenship, of each remaining Indirect Purchaser. See Indymac Mortgage Holdings, Inc. v. Reyad, 167 F. Supp. 2d 222, 241 (D. Conn. 2001) ("[T]he citizenship of individuals, not their residence, must be pleaded.") And, Plaintiffs have not established that the five (5) Indirect Purchasers each suffered losses in excess of $75,000 with respect to retail pineapple purchases, a proposition which seems implausible on its face. See Lupo v. Human Affairs Int'l, Inc., 28 F.3d 269, 273 (2d Cir. 1994) ("[T]he party asserting diversity jurisdiction in federal court has the burden of establishing the existence of the jurisdictional amount in controversy."); see also Phipps v. Praxair, Inc., No. 99 Civ. 1848, 1999 WL 1095331, at *2 (S.D. Cal. Nov. 12, 1999) ("The law is well-settled that multiple plaintiffs who join in a single lawsuit to enforce 'separate and distinct' rights may not reach the requisite amount in controversy by aggregating their claims.").

Because the Indirect Purchasers' Sherman Act claims fail as a matter of law and because they have not established diversity jurisdiction, the Court declines to exercise supplemental jurisdiction over their state law claims. See Bernstein v. New York, 591 F. Supp. 2d 448, 469 (S.D.N.Y. 2008) ("When a plaintiff has not alleged diversity jurisdiction and her federal claims fail as a matter of law, courts generally decline to exercise supplemental jurisdiction over

---

[21]     Because the Indirect Purchasers' Sherman Act claims fail as a matter of law, Defendants' objections to Dr. Tinari's proposed damages testimony, (see Defs. Mem. at 44), are moot. See also In re Pineapple, 2008 WL 5561873, at *6 (Dr. Tinari "has not presented a reliable methodology for determining damages to the [proposed Indirect Purchaser] class.") (internal quotations and citations omitted).

[22]     Neither parties' briefing papers appear to address the Indirect Purchasers' state law claims.

remaining state law claims."); see also Schor, 378 F. Supp. 2d at 860 ("[T]he court declines to exercise supplemental jurisdiction over the remaining [indirect consumer's] state law claims.").

## V.    Conclusion and Order

For the foregoing reasons, Defendants' motion to exclude expert testimony and for summary judgment [#190] is granted.  The Indirect Purchasers' state law claims are dismissed without prejudice.  The Clerk of the Court is directed to close this case.

Dated: New York, New York
        September 30, 2009

RMB
_____
RICHARD M. BERMAN, U.S.D.J.